Filed 9/10/14  In re S.C. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re S.C., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY, <br><br>　　　　Plaintiff and Respondent, <br><br>v. <br><br>K.C., <br><br>　　　　Defendant and Appellant. | A140001 <br><br> (Alameda County Super. Ct. No. OJ12019694) |

Appellant K.C. is the presumed father (Father) of S.C. (Minor).  Father contends the juvenile court's order regarding visitation was an improper delegation of judicial authority, and particular jurisdictional findings are not supported by substantial evidence. We affirm the court's orders.

BACKGROUND[1]

In November 2011, Minor, born April 2005, was living with his mother (Mother) and his two siblings in Marin County.[2]  The Marin County Health and Human Services

---

[1] Factual background primarily relevant to specific issues on appeal is provided in the discussion of those issues.  Portions of this background are taken from this court's prior decision in the same dependency matter, *In re E.L.* (Cal. Ct. App., July 19, 2013, A136428) 2013 WL 3789656.

[2] Father is not the father of Minor's siblings.

1

Department (Department) had received numerous referrals regarding the family, and the Department filed a petition alleging Minor and his siblings were at substantial risk of physical harm after a home visit during which the child welfare worker saw a man in the home who appeared to be under the influence of drugs.

At the jurisdictional hearing, both Mother and Father submitted to jurisdiction, and the juvenile court found true the allegations of the petition. At the dispositional hearing, Mother and Father submitted and Father was granted unsupervised visitation with Minor. Minor and his siblings remained with Mother, but subsequently moved in with the maternal grandmother in Oakland. In May 2012, the Department filed a Welfare and Institutions Code section 387 petition,[3] and at the detention hearing Minor and his siblings were placed with the maternal grandmother. Father also filed a section 388 petition seeking custody of Minor; the petition was denied, but the court ordered that Father receive services and visitation.

At the combined jurisdictional/dispositional hearing, the court sustained the Department's petition and ordered Minors removed from Mother's custody. The juvenile court ordered Minor placed with Father and Minor's siblings placed with the maternal grandmother. In August 2012, the court ordered the case transferred to Alameda County.

In November 2012, the Alameda County Social Services Agency (Agency) received information regarding possible physical abuse of Minor in Father's home. On December 14, the Agency filed a supplemental section 387 petition. It alleged Minor has been physically abused, neglected, and put at risk of emotional abuse by Father and his wife (Stepmother). The petition sought to change Minor's placement to a different relative's home. Minor was taken into protective custody and placed with the maternal grandmother.

On September 26, 2013, the juvenile court sustained as true eight of the ten allegations in the Agency's section 387 petition, as amended. The sustained allegations related to physical discipline imposed by Father and Stepmother; verbal and emotional

---

[3] All further undesignated section references are to the Welfare and Institutions Code.

2

abuse by Stepmother; and the Minor's "deep anger and resentment" towards Stepmother and unwillingness to live in Father's home.

The juvenile court found the previous disposition had been ineffective and removed Minor from Father's custody, with reunification services to Mother and Father. The court directed the Agency "to arrange for visitation between the child and the mother and father as frequently as possible consistent with the child's well-being." This appeal followed.

## DISCUSSION

I. *Visitation*

Father contends the juvenile court's order regarding visitation was an improper delegation of judicial authority. We disagree.

A. *Background*

Following the December 2012 detention of Minor, it was difficult to schedule visitation with Father due to the fact that he lived in Stockton, his work schedule, and the need for the visits to be supervised due to the abuse allegations. Father and Minor had a visit on February 8, 2013, which was the first visit since Minor was removed from Father's home. There had been only one further visit by the time of the court's September 26 decision.

At the September 26, 2013 hearing, the juvenile court adopted the Agency's recommendation as to visitation, to the effect that the Agency was ordered "to arrange for visitation between the child and the mother and the father as frequently as possible consistent with the child's well being."

Mother's counsel was not present at the September 26 hearing. Instead, the maternal grandmother's counsel made a special appearance for Mother's counsel "for purposes of this decision only." Near the close of the hearing, after the juvenile court had already adopted the Agency's recommendation regarding visitation, the court asked, "I want to know if there is a need for further discussion regarding visitation?" Counsel for Father responded in the affirmative, and added "On behalf of the father, I am sure that he feels that he has had a year of supervised visitation if he were to avail himself of it. I

3

don't see the reason for supervised visitation. If the Court does, I guess that will continue. I would ask that the visitation be unsupervised." The court responded, "I can set the matter for a hearing at a time when [Mother's counsel] can be available or other arrangements can be made. But I'm not prepared to ask [maternal grandmother's counsel] to act beyond the scope of the authority that she's been granted which was to appear for decision only. I am happy to give this case more time and deal with any issues that need to be addressed."

In response to the juvenile court's comments, counsel for the maternal grandmother suggested mediation on the visitation issue. The Agency stated its opposition to unsupervised visitation, and noted that Father had only seen Minor twice in the last nine months and had not reached out to the Agency to arrange visitation. Father submitted. The juvenile court declined to refer the matter to mediation and stated, "If someone feels that this can't be accomplished through the Agency, you are invited to return the matter to court so we can take a look at it and troubleshoot the problem."

B.     *Analysis*

"Visitation is a necessary and integral component of any reunification plan." (*In re S.H.* (2003) 111 Cal.App.4th 310, 317; see *In re C.C.* (2009) 172 Cal.App.4th 1481, 1491.) "It is the juvenile court's responsibility to ensure regular parent-child visitation occurs while at the same time providing for flexibility in response to the changing needs of the child and to dynamic family circumstances. [Citations.] To sustain this balance the child's social worker may be given responsibility to manage the actual details of the visits, including the power to determine the time, place and manner in which visits should occur." (*In re S.H.*, at p. 317.)

Father contends the juvenile court's order was an improper delegation of judicial discretion because the order failed to specify "the amount of visitation to be provided." There is a split of authority regarding whether juvenile court orders must specify the frequency of visitation. (See *In re S.H.*, *supra*, 111 Cal.App.4th at p. 319.) *In re Jennifer G.* (1990) 221 Cal.App.3d 752, 757, concluded that juvenile courts must balance the "interests of the parent in visitation with the best interests of the child . . . [and] determine

4

whether there should be any right to visitation and, if so, the frequency and length of visitation." (Accord *In re Shawna M.* (1993) 19 Cal.App.4th 1686, 1690.)[4] On the other hand, *In re Moriah T.*, *supra*, 23 Cal.App.4th at page 1376, concluded that "[r]equiring a disposition order to specify frequency and length of visitation compromises the ability of the county agency to fulfill its statutory mandate to supervise each case in a manner consistent with the child's best interests." The court reasoned, "A juvenile court cannot be expected to anticipate and promptly respond to changing dynamics of the relationship between parent or guardian and child, which changes may dictate immediate increases or decreases in visitation or demand variations in the time, place and length of particular visits." (*Ibid.*; accord *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1009.)[5]

In the circumstances of the present case, it was appropriate for the juvenile court to issue an order that did not specify the frequency of visitation. The record before the court demonstrated it was not possible to predict what frequency of visitation would be feasible, in light of the distance between the residences of Father and Minor, Father's work schedule, and other variables. Furthermore, the court indicated its willingness to modify its order to address any difficulties that might emerge in facilitating visitation. In that context, the determination of the frequency of visits was an aspect of the time, place, and manner determination that may properly be delegated to the Agency. (*In re Moriah T.*, *supra*, 23 Cal.App.4th at p. 1376.) The juvenile court's visitation order was not an improper delegation of judicial authority.[6] We need not and do not, however, decide

---

[4] Other cases cited by Father are inapposite, because they involve situations where the effective ability to control visitation was delegated to another parent (*In re T.H.* (2010) 190 Cal.App.4th 1119, 1123-1124) or a minor (*In re S.H.*, *supra*, 111 Cal.App.4th at p. 319). In contrast, the Agency " 'acts as an arm of the court in the best interests of the minor.' " (*In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1374.)

[5] Another case, *In re E.T.* (2013) 217 Cal.App.4th 426, stated, "the visitation order must give some indication of how often visitation should occur." (*Id.* at p. 439.) But the decision cited *Moriah T.* and *Christopher H.*, which do not support that assertion.

[6] Of course, "[i]f the [A]gency is abusing its responsibility in managing the details of visitation, [Father] may bring that matter to the attention of the juvenile court by way of a section 388 petition to modify the visitation order." (*In re Christopher H.*, *supra*, 50 Cal.App.4th at p. 1010.)

whether juvenile courts should normally specify the frequency of visitation in cases that present fewer practical obstacles to visitation.

II. *Substantial Evidence*

Father challenges two of the eight jurisdictional allegations sustained by the juvenile court. Father challenges the sufficiency of the evidence supporting the true finding as to allegation S-1.A., which provided, "In or about September 2012 the father 'whipped' the minor with a belt for fighting with another child at school by making the minor lay across a bed with his clothes off, the minor has marks on his back from the 'whipping' and the minor arose from that whipping with significant pain in his jest [sic] area that lasted for several months after the 'whipping'." He also challenges the sufficiency of the evidence supporting the sustained allegation in S-1.E. that "On or about 2/22/13 the minor disclosed that [Stepmother] 'whipped' him by making the minor lay across the bed while she hit him with a belt."

"A section 387 supplemental petition is used to change the placement of a dependent child from the physical custody of a parent to a more restrictive level of court-ordered care. [Citations.] In the jurisdictional phase of a section 387 proceeding, the court determines whether the factual allegations of the supplemental petition are true and whether the previous disposition has been ineffective in protecting the child. [Citations.] If the court finds the allegations are true, it conducts a dispositional hearing to determine whether removing custody is appropriate. [Citations.] A section 387 petition need not allege any new jurisdictional facts, or urge different or additional grounds for dependency because a basis for juvenile court jurisdiction already exists. [Citations.] The only fact necessary to modify a previous placement is that the previous disposition has not been effective in protecting the child." (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1161.)

"We review the court's jurisdictional and dispositional findings for substantial evidence. [Citations.] Evidence is ' "[s]ubstantial" ' if it is ' " 'reasonable, credible, and of solid value.' " ' [Citation.] We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record in favor of the juvenile court's order

6

and affirm the order even if other evidence supports a contrary finding. [Citations.] The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order." (*In re T.W.*, *supra*, 214 Cal.App.4th at pp. 1161–1162.)[7]

A. *Background*

In November 2012, allegations arose regarding the imposition of physical discipline at Father's home. Mother's attorney reported to Agency that Minor was hit in Father's home. Mother alleged Minor was punched and thrown in a closet, and the maternal grandmother reported Minor told her Stepmother " 'whips' " him. Minor initially denied the allegations when questioned by the Agency child welfare worker. However, after speaking to Mother by speakerphone in the presence of the worker, Minor admitted he was " 'whipped' " with a belt in the chest area by Father because Minor hit another boy at school. He said the whipping resulted in a bruise. Minor said the location of the injury was still painful. The incident related to discipline imposed after Minor was suspended from school on September 26, 2012 for fighting.

On December 4, 2012, Minor reported to his counsel that he was hit by Father with a belt in the chest and that the injury was still painful. On December 20, after the detention of Minor, Father admitted he " 'whipped' [Minor] twice with a belt on his bottom." He denied he hit Minor in the chest area.

Minor, who was in first grade, was interviewed by CALICO[8] in February 2013. He described getting "whooped" by Father after getting into a fight at school. Father hit him on his behind "really hard" with a belt; Minor's pants and underwear were down and he was lying on his stomach on a bed. Afterwards, his chest hurt and he had a big bruise

---

[7] Although the sustained allegations not challenged on appeal provide a sufficient basis to support the section 387 petition, we exercise our discretion to consider Father's claims because the challenged findings of physical abuse may impact, at least, the remainder of the dependency proceeding, including visitation and future placement decisions. (See, e.g., *In re D.P.* (2014) 225 Cal.App.4th 898, 902; *In re Drake M.* (2012) 211 Cal.App.4th 754, 762.)

[8] The acronym CALICO stands for the "Child Abuse Listening Interviewing and Coordination Center." (*People v. Esmaili* (2013) 213 Cal.App.4th 1449, 1455.)

on his chest. He wasn't sure how his chest got hurt. Minor also said Stepmother hit him with a belt while he was on the bed.

A June 2013 Agency report related that a doctor at Children's Hospital in Oakland saw Minor in December 2012 and saw marks on Minor's back. The doctor did not ask Minor about the origin of the marks. The doctor did not make a child abuse report because the maternal family informed the doctor that Agency was already involved. Mother subsequently testified that Minor told the doctor he got the marks from a whipping. Similarly, the maternal grandmother subsequently testified that Minor told her and the doctor that he got the scars from when he got whipped by Father for fighting at school.

The Agency's June 2013 report also related a consultation with a doctor who could not explain why Minor would still be complaining of pain in his chest two months after the alleged abuse. The doctor said there could be pain even without a visible injury, and he also said an asthmatic attack could cause chest pain.

On July 19, 2013, Minor testified at the jurisdiction and disposition hearing. He testified he was afraid of Father and described an incident when he was suspended from school and Father spanked him on his bottom with a belt. The spanking did not leave bruises on his bottom, but it left bruises on his back. Minor did not know how the spanking on his bottom resulted in bruises on his back. Also, Minor does not want to live with Stepmother because she sometimes hits him. He described an instance when she spanked him on his bare bottom with her hand. He did not remember her ever hitting him with a belt. Minor also testified he has asthma and when he coughs a lot he has pain in his chest.

Stepmother denied hitting Minor with a belt. She testified Father spanked Minor with a belt on his bottom while Minor was dressed. She never observed any scarring on Minor's back and he never complained of chest pain.

A September 2013 Agency report related that the child welfare worker visited Minor in August 2013 and there were still visible scars on Minor's back.

B.    *Analysis*

8

In sustaining the S-1.A. allegation, the juvenile court found that, "In or about September 2012 the father 'whipped' the minor with a belt for fighting with another child at school by making the minor lay across a bed with his clothes off, the minor has marks on his back from the 'whipping' and the minor arose from that whipping with significant pain in his jest [sic] area that lasted for several months after the 'whipping'." As set forth above, Minor's July 2013 testimony supports most aspects of that allegation, including that Father whipped him with a belt while Minor was on the bed, and that the whipping resulted in marks on Minor's back. Regarding those aspects of the finding, Father argues that Minor previously denied abuse by Father; that there was no medical or expert evidence linking the marks to the whipping; and Minor did not explain how a whipping on his bottom resulted on marks on his back.[9] However, Father cites no authority that the fact that Minor previously gave different accounts means the trial court could not rely on Minor's testimony or that any medical or expert evidence was necessary to sustain the finding. We defer to the trial court's assessment of Minor's credibility with respect to those aspects of the finding. In particular, the connection Minor drew between the whipping and the marks was sufficiently clear and certain to sustain the court's finding.

The other aspect of the finding that Father challenges is the allegation that the whipping resulted in chest pain that lingered for months. There is substantial evidence that Minor "arose from that whipping with significant" chest pain, because he described in his CALICO interview suffering chest pain after the beating with the belt. The only evidence supporting the further allegation that the chest pain due to the whipping lingered for months was contained in the Agency's December 2012 report. The report related that, two months after the whipping, Minor told both his counsel and the child welfare worker that he had been whipped in the chest and still had pain from the whipping. The Agency consulted a doctor who could not explain why Minor would have lingering chest pain, but who also said it was possible to have pain with no visible injury.

---

[9] Father also argues it is unlikely the marks were due to Father's whipping based on various other circumstances and Father's proposed inferences from those circumstances. Father's arguments do not negate the evidence supporting the juvenile court's findings.

Father points out that, in issuing its decision on September 26, 2013, the juvenile court observed there "was no clear explanation or nexus between" the whipping and the lingering chest pain; the court also stated, "I don't suggest that that [chest] sensitivity is connected to this particular punishment inflicted in September." However, to the extent there is a conflict between the court's oral comments and written findings, the court's written findings and order control. (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 756, fn. 1; see *Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1451 ["Because we review the correctness of the order, and not the court's reasons, we will not consider the court's oral comments or use them to undermine the order ultimately entered"].) Father also points out that Minor testified he thought it was chest pain from coughing that he described to the Agency child welfare social worker. However, as the juvenile court pointed out at the time, it was unclear whether that testimony related to the complaint of chest pain in November 2012.

We recognize that Minor offered varied descriptions of the injuries that followed Father's whipping with a belt. In particular, in one group of reports he described injury to his chest and in another he described injury to his back. One view of that evidence is that Minor suffered injury either to his chest or his back, but not both. Another view, reflected in the juvenile court's findings, is that Minor suffered both injuries but simply failed to report both at the same time. We are obligated to defer to the court's resolution of that evidentiary issue and therefore conclude there is substantial evidence to support the court's finding that following the whipping there was lingering chest pain, as well as marks on Minor's back.

In sustaining the S-1.E. allegation, the juvenile court found that "On or about 2/22/13 the minor disclosed that [Stepmother] 'whipped' him by making the minor lay across the bed while she hit him with a belt." The parties agree the Agency intended to allege the disclosure was true. Although Minor testified in July 2013 that Stepmother did not hit him with a belt, he said that Stepmother hit him with a belt in the February 2013

10

CALICO interview.  We defer to the juvenile court's assessment that the CALICO interview was more reliable on that point.[10]

DISPOSITION

The juvenile court's orders are affirmed.

 

 

_____<br>SIMONS, J.

We concur.

_____
JONES, P.J.

_____
NEEDHAM, J.

_____

[10] In his briefing on appeal Father makes reference to "the parental privilege to reasonable parental discipline," but he cites no authority that such privilege prohibited the juvenile court from sustaining the section 387 petition based on the allegations in the petition.