Filed 5/30/13; pub. order 6/21/13 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re E.T., A Person Coming Under the Juvenile Court Law. | B243407 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK92328) |
| Plaintiff and Respondent, | |
| v. | |
| L.T., | |
| Defendant and Appellant; | |
| C.M., | |
| Real Party in Interest. | |

APPEAL from orders of the Superior Court of Los Angeles County. D. Zeke Zeidler, Judge. Reversed.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant L.T.

Darlene Azevedo Kelly, under appointment by the Court of Appeal, for Real Party in Interest, C.M.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jacklyn K. Louie, Principal Deputy County Counsel, for Plaintiff and Respondent Department of Children and Family Services.

_____

Mother, L.T., appeals from the juvenile court's dispositional order granting custody of minor E.T. to his biological father, C.M.  Father admits he never achieved presumed father status, but nonetheless contends the appeal is moot because the court subsequently removed E.T. from his custody upon the filing of a supplemental petition alleging neglect by father.  Mother also contends the court's visitation order, providing that "[t]he Department is to create a detailed visitation order for mother[,]" is prejudicially vague.  The Department of Children and Family Services (Department) filed a letter brief "taking no position" on mother's challenge to the custody order, and "not oppos[ing] a remand for a proper visitation order."  We find this appeal is not rendered moot by the court's later order removing E.T. from his placement with C.M.  Because C.M. was a mere biological father, and was not entitled to presumed father status, the order granting him custody was in error.  We also agree that the visitation order failed to adequately specify the frequency and duration of mother's visits, and reverse and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 27, 2012, the Department received a referral alleging that 21-month-old E.T. was neglected by mother.  Mother and E.T. shared a home with maternal grandmother and an older sibling (over whom maternal grandmother had a guardianship due to mother's drug use), and maternal great grandparents.  E.T. had lived in this home for his entire life.  Mother would often leave E.T. with maternal relatives without making plans for his care, and without specifying when she would return.  She would leave E.T. for days without calling to check on him.  Mother admitted leaving E.T. with maternal relatives for days at a time while she stayed with friends, and that she does not always

2

return when she says she will.  She also admitted that she does not contact maternal relatives to let them know when she is not going to return as planned.

Mother has a history of illegal drug abuse.  She started using marijuana when she was 14 (in 1995), and graduated to methamphetamine when she was 16 (in 1997).  Mother completed a drug program in September 2006, and claims she has not used illegal drugs since then.

Mother also has a history of mental health problems.  She was diagnosed as bipolar in 2007, and was prescribed medication.  She stopped taking her medication once she became pregnant with E.T.  She was hospitalized several times in the last seven years because she attempted suicide.  Her last hospitalization was in 2010.

At the request of the Department, mother drug tested on February 8, 2012.  The test was positive for amphetamine and methamphetamine.  When the social worker went to the family home, maternal great grandfather reported that mother left the home over the weekend, and had not returned or contacted them.  E.T. was ill over the weekend, and mother did not return the family's calls.

Maternal grandmother reported that E.T. had a fever and was vomiting.  She did not know where mother was, and left voicemail messages for mother that E.T. was sick.  Mother did not return any of her calls.  Maternal grandmother took E.T. to the emergency room, and had difficulty obtaining treatment for E.T. because she did not have an authorization to receive medical care for E.T.  Eventually, she was able to get him treated.  Maternal grandmother was concerned that mother was currently using drugs; she was exhibiting many of the same behaviors that led grandmother to seek guardianship over mother's older child.

Mother eventually called the Department social worker.  She said E.T. was not sick when she left him, and that she did not receive any phone calls concerning his illness because she had turned off her phone over the weekend.  When confronted with the positive drug test, mother explained that perhaps she was around someone who was using drugs, causing her to test positive.  She did admit to using drugs on Sunday (over the

3

weekend that E.T. became ill) because maternal great grandmother had been diagnosed with cancer, and this was difficult for mother to deal with.

A team decision-making meeting was held on February 17, 2012. Mother, maternal grandmother, maternal great grandparents, and maternal aunt attended. At the meeting, mother claimed her recent positive drug test must have been a mistake. She only used drugs over the weekend that E.T. became ill. Nevertheless, all parties agreed the Department's supervision was necessary to protect E.T. Mother agreed to leave the family home so that E.T. could stay there under the care of maternal grandmother.

Mother refused to disclose to the Department the identity of E.T.'s father, who had not provided for E.T.'s support.

At the February 29, 2012 detention hearing, the trial court ordered E.T. removed from mother and placed with maternal grandmother. The court ordered monitored visitation for mother, and allowed maternal grandmother to monitor the visits. Mother also submitted a signed declaration of paternity indicating that father's identity was "unknown."

The Department's April 11, 2012 jurisdiction/disposition report reflected that the family home was clean and safe, and that none of the occupants had any criminal or child abuse histories. Mother had only one visit with E.T. since his detention and called maternal grandmother only for money rather than to arrange visits. Mother did not return calls from the Department. Because mother refused to identify father, the Department completed a due diligence search. The due diligence did not identify or locate E.T.'s father. No father was identified on E.T.'s birth certificate.

At the April 11, 2012 adjudication hearing, mother pled no contest to the petition, and the following allegations were sustained:

> "[Under Welfare and Institutions Code, section 300, subdivision (b)[1]] . . . [M]other . . . has a history of illicit drug abuse, including marijuana, and is a recent abuser of amphetamine and methamphetamine, which periodically

---

[1] All further undesignated section references are to the Welfare and Institutions Code.

4

renders the mother incapable of providing regular care and supervision of the child. On 02/08/2012, the mother had a positive toxicology screen for amphetamine and methamphetamine. On 02/08/2012 and on prior occasions, the mother was under the influent of illicit drugs, while the child was in mother's care and supervision. The mother's illicit drug abuse endangers the child['s] physical health and safety and places the child at risk of physical harm and damage.

"[Under section 300, subdivision (b)] . . . On 02/18/2012 and on prior occasions, . . . mother . . . left the child in the care of maternal grandmother . . . and maternal relatives without making an appropriate plan for the child's ongoing care and supervision. The mother's whereabouts were unknown to the maternal grandmother and maternal relatives. On 02/18/2012, the child suffered from a fever and vomiting and required medical treatment. The mother failed to provide the maternal grandmother with medical authorization to obtain medical care for the child. The mother's failure to make an appropriate plan for the child's care and supervision endangers the child's physical health and safety and places the child at risk of physical harm and damage."

Mother finally identified father at the hearing, and informed the court that he had filed a paternity action at the Norwalk courthouse. The court continued the matter to May 14 for a further disposition hearing, and for further due diligence now that father's name had been disclosed.

In a May 14, 2012 last minute information for the court, the Department informed the court that it had obtained information regarding father's paternity action from the Norwalk courthouse. The Department also reported that father had a child welfare history, consisting of substantiated referrals for physical abuse in November of 2000, and emotional abuse in April of 2001. Father used "excessive and inappropriate physical discipline" on his stepchildren. He completed a 26-week domestic violence program and a parenting class, and jurisdiction was terminated in February 2002.

The Department interviewed father. He had no contact with mother since December 2010. Mother refused to allow him to see E.T., and so he filed for shared custody and visitation. Father admitted to domestic violence problems with an ex-wife with whom he has two children. He also admitted to being sentenced to prison for three

years for domestic violence in 2003. He denied any other criminal history. Father ended his relationship with mother while she was pregnant with E.T. He ensured she received prenatal care before their relationship ended. Father only saw E.T. three or four times after he was born.

Father filed an order to show cause re: child custody and visitation in family court in October 2010. In her responsive declaration, mother did not consent to custody, and wanted only monitored visitation for father. She declared that father "may or may not be the father" of E.T. as she had "multiple sexual partners . . . around the approximate time of conception." She further declared she was concerned about E.T.'s safety because of father's methamphetamine use. Moreover, father did not have a stable and permanent residence of his own, and was involved in a police chase while his sons from another relationship were with him in the car. At the January 8, 2011 order to show cause hearing, the family court ordered paternity testing, and ordered each party to pay for half the cost. Father failed to appear at the continued order to show cause hearing, and failed to pay for his share of the paternity testing. Accordingly, the order to show cause was placed off calendar.

Father appeared at the May 14, 2012 disposition hearing. The court ordered paternity testing. The court also gave the Department discretion to release E.T. to father if paternity was established. Father was also to receive unmonitored visits upon positive paternity results. The June 5, 2012 paternity results established that father was E.T.'s biological father. On June 22, 2012, the trial court found that father was E.T.'s biological father. The court ordered unmonitored visitation for father.

On June 28, 2012, the Department filed a supplemental petition under section 342, which included new allegations about father. The petition alleged father "has a history of illicit drug abuse and is a frequent user of methamphetamine which renders the child's father incapable of providing regular care and supervision for the child. The father's illicit drug abuse endangers the child's physical health and safety and places the child at risk of physical harm and damage."

6

In a June 28, 2012 supplemental report, the Department described father's child welfare history. The Department received a referral in November 2000, alleging that father hit his stepdaughters in the face with a baseball bat, his fists, and a hanger, causing bruising. The allegations were substantiated, and the family was under court supervision between November 2000 and April 2002. The Department also received a substantiated referral in April 2001 for emotional abuse of father's biological child. Father pulled the child across the yard with enough force to nearly pull his arm out of the socket. Father also threatened to put a "hit" on the child's stepfather.

Father also has an extensive criminal history. He has a 1991 conviction for assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)); two 2002 arrests for inflicting corporal injury on a spouse (Pen. Code, § 273.5, subds. (a), (e)(1)); a 2003 conviction for evading a police officer (Veh. Code, § 2800.2), willful cruelty to a child (Pen. Code, § 273a, subd. (b)), and corporal injury on a spouse (Pen. Code, § 273.5, subd. (e)(1)), for which he was sentenced to three years in prison; a 2005 conviction for possession of a controlled substance for sale (Health & Saf. Code, § 11378); as well as two warrants for parole violations in 2006 and 2007 (Pen. Code, § 3056).

Moreover, father was living with people with criminal histories. His fiancé, V.A., was arrested in 2008 for possession of a controlled substance. (Pen. Code, § 4573.6). His future father-in-law had a driving-under-the-influence conviction from 2009.

In late June 2012, father had a visit with E.T. in maternal grandmother's home. Maternal grandmother reported the visit went well, but she was concerned E.T. would be traumatized by unmonitored visits with father, because he did not know father and the two did not have a relationship.

Father denied any current drug use to the Department social worker, and denied ever being caught with drugs in his possession. He did admit to completing a Proposition 36 drug program, but claimed he did so simply to reduce his prison sentence. However, he was ordered to participate in a Proposition 36 program for his 2005 drug conviction. When confronted with his drug conviction, father said that it must be a mistake, and must be for someone else with his same name. Father claimed to have had no trouble with

drugs or the law since his release from prison. Based on his history, the Department recommended that father's contact with E.T. be monitored.

Mother and father testified at the June 28, 2012 combined disposition hearing for the original section 300 petition, and the detention hearing for the section 342 supplemental petition. As to the section 342 petition, mother testified that she had used methamphetamine with father "[a] lot of times" and had last used methamphetamine with father in June of 2009. Their relationship had lasted 10 months, and they used drugs together nearly the entire time. The last time father saw E.T. was when he was one month old, and then father stopped visiting. Mother never hid E.T. from father.

Father testified that he completed a Proposition 36 program, and completed a "substance abuse foundation" while in prison in 2003. He admitted to being arrested in 2005 on drug charges, and that he completed the Proposition 36 program because of that arrest. Father denied telling the Department social worker he completed the Proposition 36 program to get less prison time, and denied that he told her the arrest for drugs was a "mistake." When asked when was the last time he used drugs, father claimed, "I never used. I was selling in 2005."

The trial court observed that its ruling on the section 342 petition turned on whether mother or father was a more credible witness regarding father's drug use. The court found father to be more credible. "[I]f you . . . go back to the detention report where [mother] even refused to name who the father was or say anything . . . it's one more indication of her lack of being forthcoming and having some motive to keep the father out of the case or the child's life." The court dismissed the section 342 petition.

As to the disposition on the original section 300 petition, mother testified that because she was not sure who was E.T.'s biological father, mother wanted paternity testing in the family law proceeding. But, father "never showed up" to complete the testing. Mother did not identify father in the dependency proceeding because "if he wants to be the father let him do it on his own volition. I didn't feel like court should be the way to make him want to be a father." Father testified that E.T. should be released to him. Father did not complete the paternity testing in the family law proceeding because

8

he did not have the money to pay for his share of the test. He never followed up to establish his paternity because "I was kind of hurt because [mother] said I wasn't the father." He just "figured" he was not wanted at mother's family's house because he had not established his paternity.

The court concluded that removal from mother was necessary, and placed E.T. with father under a family maintenance plan. The court ordered father to submit to six random drug tests. The court ordered family reunification services for mother, and ordered that "the Department is to create a detailed visitation schedule for the mother."

Mother timely appealed.

## DISCUSSION

Mother appeals the juvenile court's dispositional order granting custody of E.T. to father, contending that only presumed fathers are entitled to custody, and that father never achieved presumed father status. Father admits he never achieved presumed father status, but contends that issue is moot because the court subsequently removed E.T. from his custody. Mother also contends the court's visitation order, providing that "[t]he Department is to create a detailed visitation order for mother[,]" is too vague. We find that mother's appeal is not moot, because allowing the order to stand may have consequences in later proceedings. We also agree that the visitation order fails to sufficiently establish the frequency and duration of mother's visits. Accordingly, we reverse.

### 1. Custody Order

Mother challenges the order granting father custody, contending the court did not find that father was E.T.'s presumed father, and that any implied finding is not supported by substantial evidence. Father admits the court never found him to be a presumed father, and that he did not qualify for presumed father status, but nonetheless contends the court properly exercised its discretion to place E.T. with him as E.T.'s *biological relative* under section 361.3.

An appeal may become moot where subsequent events, including orders by the juvenile court, render it impossible for the reviewing court to grant effective relief. (*In re*

9

*Albert G.* (2003) 113 Cal.App.4th 132, 134-135; *In re Jessica K.* (2000) 79 Cal.App.4th 1313, 1315-1317; *In re Katherine R.* (1970) 6 Cal.App.3d 354, 357; *In re Pablo D.* (1998) 67 Cal.App.4th 759, 761; *In re Dylan T.* (1998) 65 Cal.App.4th 765, 769.) "'An issue is not moot if the purported error infects the outcome of subsequent proceedings.'" (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1488.)

Mother urges that the appeal is not moot because the custody order has "collateral consequences which will continue to adversely affect mother in the underlying dependency proceedings, and potentially in future proceedings as well." Specifically, she contends the court's order resulted in neglect or abuse of E.T. while he was in father's care. Also, mother contends that father's paternity status is still at issue, and that he would automatically benefit from presumed father status if the order is allowed to stand. We agree that allowing the court's order to stand may have collateral consequences, such as the implied finding that father qualifies for presumed father status, and that mother may be unfairly prejudiced in her efforts to reunify with E.T. due to the abuse and neglect E.T. suffered while in his father's care. Therefore, we will reach the merits of the appeal.

"In dependency proceedings, 'fathers' are divided into four categories—natural [or biological], presumed, alleged, and de facto." (*In re A.A.* (2003) 114 Cal.App.4th 771, 779.) The distinction is important because only a presumed father is entitled to custody and reunification services. (*In re Kobe A.* (2007) 146 Cal.App.4th 1113, 1120; *In re Paul H.* (2003) 111 Cal.App.4th 753, 760; *In re O.S.* (2002) 102 Cal.App.4th 1402, 1406-1407.) Specifically, section 361.2 provides that "[w]hen a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).) Only a presumed father is entitled to custody under section 361.2. (*In re Zacharia D.* (1993) 6 Cal.4th 435, 451.)

10

The statutory methods for establishing a presumption of paternity are contained in the Family Code. The provision applicable here, Family Code section 7611, subdivision (d), provides that a man is presumed to be the natural father of a child if "[h]e receives the child into his home and openly holds out the child as his natural child." Moreover, there are some circumstances when a man who has not received the child into his home may be declared a presumed father, under principles of due process and equal protection, when he has been prevented by the mother from physically receiving the child into his home. (See *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 849-850.)

A man who claims entitlement to presumed father status has the burden of establishing by a preponderance of the evidence the facts supporting his entitlement. (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1210.) In carrying that burden, a biological father must establish that he "'promptly [came] forward and demonstrate[d] a full commitment to his parental responsibilities—emotional, financial, and otherwise . . . .'" (*In re Zacharia*, *supra*, 6 Cal.4th at p. 450.) "In determining whether a biological father has demonstrated such a commitment, '[t]he father's conduct both before and after the child's birth must be considered. Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. In particular, the father must demonstrate "a willingness himself to assume full custody of the child . . . ."'" [Citation.] 'A court should also consider the father's public acknowledgement of paternity, payment of pregnancy and birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child.'" (*Id.*, at p. 450, fn. 19, italics omitted.)

Here, the only paternity finding appearing in the record is that father is a biological father. Father never endeavored to establish his status as a presumed father, and never asked the court to make such a finding. Father does not dispute that the court did not find him to be a presumed father, and on appeal, he agrees that such a finding would not have been supported by the evidence. The facts discussed above plainly establish that father is not a presumed father.

Father contends, however, that as E.T.'s biological relative, he was entitled to placement of E.T. under section 361.3. Section 361.3, subdivision (a) provides, "In any case in which a child is removed from the physical custody of his or her parents pursuant to Section 361, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative." "Preferential consideration" means that "the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1).) For purposes of section 361.3, "'[r]elative' means an adult who is related to the child by blood, adoption, or affinity within the fifth degree of kinship, including stepparents, stepsiblings, and all relatives whose status is preceded by the words 'great,' 'great-great,' or 'grand,' or the spouse of any of these persons even if the marriage was terminated by death or dissolution. However, only the following relatives shall be given preferential consideration for the placement of the child: an adult who is a grandparent, aunt, uncle, or sibling." (§ 361.3, subd. (c)(2).)

Although a biological father is technically an "adult who is related to the child by blood, adoption, or affinity within the fifth degree of kinship" (§ 361.3, subd. (c)(2)), section 361.3 contemplates the placement of a child with a relative after removal from his "*parents*." (§ 361.3, subd. (a), italics added.) Moreover, "parents" are not listed as relatives entitled to preferential placement under section 361.3, and it is clear that any preference for placement with a relative is subordinate to placement with a nonoffending parent under section 361.2. Section 361.2 requires a child to be placed with a nonoffending parent unless such a placement would be detrimental, whereas section 361.3 only requires preferential *consideration* of a relative for placement. (See § 361.2, subd. (a) ["If that parent requests custody, the court *shall* place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (Italics added.)]; § 361.3, subds. (a), (c).) Furthermore, section 361.2 specifically addresses placement with a parent, and therefore makes clear that section 361.3 was not intended to address parents. Had the Legislature intended section 361.3 to apply to parents, it would have said so. (See *In re Zacharia D.*, *supra*, 6 Cal.4th at p. 451.)

Even if section 361.3 applies, it was a clear abuse of discretion to place E.T. with father rather than maternal grandmother. Father and E.T. had no relationship, whereas E.T. had grown up in maternal grandmother's home, along with his sibling, E.L. Moreover, maternal grandmother had no criminal or child welfare history, whereas father had a long history of child abuse and criminal behavior. (See *Alicia B. v. Superior Court* (2004) 116 Cal.App.4th 856, 863-864; § 361.3, subd. (a).)

Therefore, we conclude the trial court erred in placing E.T. with father, and reverse the court's dispositional order.

## 2.     Visitation Order

Mother contends the trial court's June 28, 2012 visitation order failed to ensure that she would receive reasonable visitation, when the court ordered that the "Department is to create detailed written visitation schedule for mother." The Department agrees the court's visitation order fails to establish a "minimal framework" for visitation, and therefore "does not oppose remand for a proper visitation order to be fashioned by the juvenile court." Father takes no position as to mother's challenge to the visitation order.

The court has the sole power to determine whether visitation will occur. (*In re M.R.* (2005) 132 Cal.App.4th 269, 274; *In re S.H.* (2003) 111 Cal.App.4th 310, 319; *In re Julie M.* (1999) 69 Cal.App.4th 41, 48-49.) Once visitation is ordered, the court may delegate responsibility for managing details such as the time, place and manner of visits, none of which affect a parent's defined right to see his or her child. (*In re Chantal S.* (1996) 13 Cal.4th 196, 213; *In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1374; *In re T.H.* (2010) 190 Cal.App.4th 1119, 1123.) However, the visitation order must give some indication of how often visitation should occur. (See *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1008-1009; *In re Moriah T.*, at pp. 1375-1376.) A court may not abdicate its discretion to determine whether visitation will occur to a third party. (*In re S.H.*, at pp. 317-318; see also *In re Rebecca S.* (2010) 181 Cal.App.4th 1310, 1314 ["The time, place, and manner of visitation may be left to the legal guardian, but leaving the frequency and duration of visits within the legal guardian's discretion allows the guardian to decide whether visitation actually will occur."].)

Here, the court's visitation order failed to give any indication about the frequency of the visits, effectively giving the Department discretion to decide whether visitation would actually occur.  Accordingly, we remand the matter with directions "to specify the frequency and duration" of mother's visits.  (*In re Rebecca S.*, *supra*, 181 CalApp.4th at p. 1315.)

## DISPOSITION

The June 28, 2012 dispositional order placing E.T. in the home of father is reversed.  The visitation order is reversed, and the case remanded with directions to specify the frequency and duration of mother's visits.


GRIMES, J.

WE CONCUR:


BIGELOW, P. J.


RUBIN, J.

14

Filed 6/21/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re E.T., a Person Coming Under the Juvenile Court Law. | B243407 (Los Angeles County Super. Ct. No. CK92328) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | **ORDER CERTIFYING OPINION FOR PUBLICATION** |
| L.T., | |
| Defendant and Appellant; | **NO CHANGE IN JUDGMENT** |
| C.M., | |
| Real Party in Interest. | |

THE COURT:*

The opinion in the above-entitled matter filed on May 30, 2013, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

---

*BIGELOW, P. J.　　　　　　　RUBIN, J.　　　　　　　GRIMES, J.

15