Filed 10/8/14  In re A.M. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re A.M., A Person Coming Under the Juvenile Court Law | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>    Petitioner and Respondent,<br><br>v.<br><br>PATRICIA C.,<br><br>    Objector and Appellant. | A140802<br><br>(Alameda County Super. Ct. No. SJ13021522) |

Patricia C. (mother) appeals from two dispositional orders of the juvenile court that were issued in a dependency proceeding regarding her son, A.M.  The proceedings were initiated by the filing of a petition pursuant to Welfare and Institutions Code[1] section 300 by respondent Alameda County Social Services Agency (Agency).

The juvenile court ruled that A.M., 11 years old at the time, was a dependent of the court, removed him from mother's physical custody, and placed him in the physical custody of his father Andrew M. (father).  The court ordered that mother was "not entitled to reunification services" and would be provided "informal child welfare services at the discretion" of the Agency.  Mother argues that by doing so, the court improperly

---

[1]  All further statutory citations are to the Welfare and Institutions Code.

1

delegated to the Agency the discretion to determine whether she received reunification services. We conclude that this argument lacks merit.

The juvenile court also ordered that mother be allowed visits with A.M. "as frequently as possible," which visits were to be arranged by mother and father, and supervised by father. Mother argues that by doing so, the juvenile court improperly delegated to father the authority to determine if and when she could visit with A.M. We conclude that this argument has been forfeited and, in any event, lacks merit.

Accordingly, we affirm the juvenile court's rulings.

## BACKGROUND

### *A.M.'s Detention and the Agency's Petition*

On August 22, 2013, police were called to the apartment of mother and A.M. in Oakland, California, after a disturbance was reported. They observed A.M. had scars on his arm resembling cigarette burns and found an unlocked shotgun in the home. A.M. was taken into protective custody and mother was arrested for child endangerment and obstruction of justice.

The Agency filed its petition on August 26, 2013. It alleged pursuant to section 300, subdivision (b) that AM. had suffered, or there was a substantial risk that he would suffer, serious physical harm or illness because of mother's mental health issues. The Agency alleged that A.M. had scarring on his arms consistent with cigarette burns. It also alleged that mother was observed screaming at A.M. and pulling him by the hair, barricaded herself and A.M. in a bathroom and resisted arrest, believed she was being stalked by a man, and kept an unlocked shotgun with easily accessible ammunition in her home. The Agency alleged that father had a history of substance abuse that affected his ability to care and provide for A.M. and had been charged with corporal punishment of a spouse or partner 10 years before.

The Agency further alleged pursuant to section 300, subdivision (g) that there was no provision for A.M.'s support because mother was in jail and unable to arrange for his care, A.M. had not seen father for three years, and father's whereabouts were unknown.

2

On August 27, 2013, the juvenile court held a detention hearing regarding the Agency's petition. The Agency reported that mother had been overheard yelling at A.M. several times a week and sometimes daily. A.M. had been detained after a neighbor saw mother dragging him out of their home by the hair; mother said she was trying to get him to go with her so that she could register him in school. A.M. was visibly shaken and had some cigarette burns on his arm that he said were caused by mother. Mother had told a third person that she had mental health issues. As recommended by the Agency, the court removed A.M. from mother's home and placed him in the care of the Agency.

### *The Agency's September 12, 2013, Jurisdiction/Disposition Report*

In a September 12, 2013, jurisdiction/disposition report, the Agency reported that mother was released from jail at the end of August. She had been involved in a previous section 300 case some years before regarding her daughter, who was 30 years old at the time of the report. Allegations of serious emotional damage to the daughter were found to be true. Mother was diagnosed with depression at the time, but did not complete a psychological evaluation. The daughter and mother were not reunified and the daughter "aged out of the system."[2] Also, mother's former husband expressed concerns in 2000 about mother's mental condition and reported in 2001 that she had threatened to kill him on numerous occasions.

The Agency also reported A.M.'s statements in an interview conducted on August 27, 2013, by staff of the Child Abuse Listening, Interviewing and Coordination Center (CALICO). A.M. said his mother and he had not opened the door for police for fear that a man who had been stalking them was at the door. The man had lost his own apartment in the building. A.M.'s mother had allowed the man to stay with them, but he had "tried to burn [them] up." The man gave mother a shotgun that she kept in the bedroom. A.M. thought she might have been arrested because A.M. could reach the shells for it. His

---

[2] The Agency later reported that the daughter lived in Los Angeles. She did not want A.M. placed with her because doing so would require her to move to a different residence.

mother told A.M. never to use the gun or touch the shells.  A.M. and his mother did not sleep in their apartment's bedroom because it was "haunted."

A.M. remembered not wanting to register for school on the day the police came. He denied that mother had pulled his hair.  Mother had pulled on his legs and arms, and he had "battled" with her that day.  He battled with her two or three times a week.  Some of the marks on his arm were from his mother, who put her nails into his arm to " 'snap him out of it' " when he talked back to her, and some were from him crashing his bicycle into a fence.  He denied that anyone burned him with cigarettes.

A.M. told the reporting caseworker that he loved his mother.  He was observed crying for joy when he spent time with her in a supervised visit and crying when the visit ended.

A.M. also said father was " 'on crack . . . drugs.' "  A.M.'s mother used to drop A.M. off at father's home, where he lived with his mother and cousins.  Father " 'was all dozed out' " and had " 'weird' " eyes.  Also, father would drink clear vodka.

The Agency also reported statements by mother.  She said she had been trying to move out of her apartment because she could not afford the rent.  She and her son did not sleep in the bedroom because it contained ghosts.  She had allowed a neighbor to stay with them when he lost his apartment and to store things in her bedroom.  She knew there was a shotgun in her bedroom and shells on top of the refrigerator.  She did not know it was illegal to keep such a weapon in her home.

The Agency recommended that A.M. be detained and mother be provided with reunification services.  It had not yet had contact with A.M.'s father and did not recommend services for him.

### *Events in October 2013*

On October 16, 2013, the Agency filed a second amended petition.  It contained further allegations about father's history of substance abuse, violence, and lack of contact with A.M.

4

On October 17, 2013, the Agency filed "attachments" consisting of police reports and photographs.

At the beginning of a scheduled uncontested hearing on October 17, 2013, father appeared and requested a contested hearing. The court scheduled this hearing for December 9, 2013. It ordered that father undergo twice-a-week drug testing, submit to a hair follicle test, and report to the Agency's caseworker weekly. It further ordered that father be allowed visits with A.M. as frequently as possible consistent with A.M.'s well-being.

### *The Agency's December 9, 2013, Report*

The Agency provided additional information about mother, father, and A.M in a December 9, 2013, addendum report. Mother told the Agency that A.M. had marks on his face indicating physical abuse and was seen by father being struck by the foster parent. Also, her counsel complained that A.M. was missing from his foster home at one point. The foster parent denied any of this was true. Mother also said the Agency's reporting caseworker was to blame for her problems and the Agency's reports were full of lies.

The reporting caseworker was concerned that mother was being dishonest about where she was living. A.M. said his parents were living together at his paternal grandmother's home. The grandmother denied this was the case, saying that mother only visited. The caseworker was also concerned about how father and mother would manage anger if they reunited, given their history of domestic violence.

The Agency reported that father called and reported seeing the foster parent push A.M. in the back of the head 10 days before. The reporting caseworker thought she heard mother's voice in the background during the call.

The reporting caseworker continued to have concerns about father's history of substance abuse, domestic violence, and lack of contact with A.M. Also, father had delayed participating in drug testing, missed one test, tested positive for ethanol on another (which indicated he had consumed alcohol), and twice arrived for a test of his

5

hair follicles with his hair too short for a sample to be taken.  On the other hand, he had contacted the caseworker weekly and been "very engaged" with A.M. during their visits.

A.M. had had supervised visits with mother and father together.  During one, mother was on her phone a lot, but did engage with A.M.  Father was very attentive to A.M., but the supervising caseworker thought father might be under the influence of a substance.  A.M. seemed conflicted about visitation with his parents.  He told his foster parent one day that he wanted fewer visits with them and another day that he wanted more.

A.M. seemed to have a loving relationship with his mother.  He told the reporting caseworker that the circular scars on his arm were the result of his picking on marks left by his mother when she grabbed his arm and dug in her nails.  He told his foster parent that mother had burned him on his arm.

The Agency recommended that A.M. be declared a dependent of the juvenile court and remain placed out of mother's home, mother receive reunification services, services not be provided to father unless and until he established a basis for them, and visitation be continued between mother and A.M.

### *The Jurisdiction/Disposition Hearing*

The court commenced a contested jurisdiction/disposition hearing on December 9, 2013.  It admitted into evidence the Agency's reports and six drug test reports for father.

Father testified at the hearing.  He said that he had not injured anyone in the 2003 "corporal injury" incident.  He had not used any illegal drugs since 2006.  He had used legally prescribed marijuana for medical purposes until about September of 2013, and would continue to abstain from using it if he obtained custody of A.M.  He had been charged 10 years before with driving under the influence, did not recall telling an officer at the time that he had smoked cocaine earlier that morning, and described the event as a "fix-it ticket."  He had not consumed drugs or vodka in A.M.'s presence, but had drunk alcohol around Thanksgiving.  He was not aware that he had missed a drug test in November 2013.  His hair grew very slowly, which was why he could not provide a

6

testing sample. In the past, he had completed a program regarding domestic violence and another presented by Narcotics Anonymous.

Father testified that he had not seen A.M. for about two years before their recent visits. As a result of the 2003 incident, he had not gotten along with mother and had been ordered to stay away from her. He decided to stay away until mother was "ready." His conversations with mother were civil now because he did not let words get to him like he had in the past. He had visited with A.M. four times, and the visits had gone well. He currently lived with his mother, and a room for A.M. was available there. He had not parented a child, but had looked after nieces and nephews in his large family. He was working 35 hours a week as a janitor.

The Agency maintained its recommendations, except it recommended reunification services for father as well because the court had determined he was a presumed father. The Agency's counsel expressed concerns about father's testimony and the evidence that he had a history of substance abuse and domestic violence. The Agency's counsel asked the court to sustain the allegations against him.

Minor's counsel asked the court to take jurisdiction and remove A.M. from mother's care. He argued that, pursuant to section 361.2, the court was required to place A.M. with father, a noncustodial parent, unless the court found by clear and convincing evidence that doing so would be detrimental to A.M. He asked the court to continue the hearing so that more information could be gathered in light of the concerns about father's substance abuse and domestic violence history.

Mother did not contest jurisdiction. Her counsel argued there was no evidence to support denying father custody of A.M. He said mother wanted custody of A.M. and, absent that, for father to have it. Otherwise, mother "apparently" had a third party who was ready, willing, and able to take custody.

Father's counsel similarly argued there was no evidence to support denying father custody of A.M. He asked the court to reject the Agency's petition allegations against father, find him to be a nonoffending parent, and order that A.M. be placed with father.

The court took the matter under submission and ordered father to continue with twice-a-week testing.

### *The Juvenile Court's Rulings*

At a January 9, 2014, hearing, the juvenile court found the allegations in the petition to be true, except for the allegations of substance abuse and domestic violence against father. It declared A.M. to be a dependent of the court. It found by clear and convincing evidence that he should be removed from the physical custody of the mother because of the substantial danger to his physical health, safety, protection, or physical or emotional well-being. It ordered A.M. to be in the care, custody, and control of father, who was to receive family maintenance services. The court found that mother was "not entitled to reunification services under section 361.2, but will be provided . . . informal child welfare services at the discretion of the [Agency]." The court continued the matter six months for a dependency status review in the family maintenance program.

After the court concluded its remarks, mother's counsel requested that mother be allowed visits with A.M. as frequently as possible, which visits would be arranged by mother and father, and supervised by father. The court granted this request and adjourned the proceedings. The court's minute order memorialized its rulings at the hearing and incorporated the recommendations of the Agency, as amended by the court.

On January 14, 2014, a third amended petition was filed. It excluded the allegations against father that the court had rejected.

On January 21, 2014, mother filed a timely appeal from the court's findings and orders.

### DISCUSSION

### I. *Reunification Services*

Mother first argues that the juvenile court erred "when it delegated to the [A]gency the court's duty to either grant or deny reunification services to [mother]." She requests that we reverse and remand to the juvenile court with the instruction that she be provided reunification services.

8

Mother's argument lacks merit. It is based on the false premise that the court delegated to the Agency the authority to decide whether mother would receive reunification services. The court did not. To the contrary, it denied mother reunification services. Specifically, at the January 9, 2014, hearing, the court found that the Agency's allegations of mother's abuse of A.M. were true and ruled that she was "not entitled to reunification services under section 361.2." That the court also ordered the Agency to provide *informal* child welfare services to mother at the Agency's discretion had no effect on this denial.

Mother argues that the terms "child welfare services" and "reunification services" are used interchangeably in section 361. Assuming for the sake of argument that this is the case, it makes no difference. The key is the court's ruling that mother was "not entitled" to these services. Read in context, this can only mean one thing: the court denied her reunification services. It did not leave the matter to the Agency to decide.

Nor was there anything improper about the court's decision to deny mother reunification services. As mother states in her opening brief, section 361.2 provides that a child must be placed with a noncustodial parent if the child is removed from the custodial parent, "unless [the court] finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).) If the court places the child with a noncustodial parent, it may "[o]rder that the parent assume custody subject to the supervision of the juvenile court." (§ 361.2, subd. (b)(3).) The court may order services be provided solely to the parent who is assuming physical custody, solely to the parent from whom the child is removed, or to both parents. (§ 361.2, subd. (b)(3).)

In such circumstances, "[t]he decision whether to provide services and to which parent is discretionary to the court because the child is not out of the home, but in placement with a parent." (*In re Gabriel L.* (2009) 172 Cal.App.4th 644, 651.) As the Agency points out, " 'The juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion.' [Citation.] . . . [T]he court has discretion to provide

9

services for the nonreunifying parent if the court determines that doing so will serve the child's best interests. The court also has discretion to find that the ordering of such services to the nonreunifying parent is not in the child's interest and to not order services for that parent." (*Id*. at p. 652.)

The juvenile court's denial of reunification services to mother was in accordance with its discretionary power pursuant to section 361.2. While mother argues that the record "amply supports providing reunification services" to her, she does not argue that the juvenile court abused its discretion in denying them to her. Therefore, we have no reason to further evaluate the court's exercise of its discretion. We need only determine whether or not the court exercised it. We conclude the court did so. Mother's argument is without merit.

## II. *Visitation*

Mother next argues that the juvenile court was required to, but did not, specify the frequency of visits she would be allowed to have with A.M., instead delegating to father whether such visits would occur at all. We agree with the Agency that mother has forfeited this appellate claim by failing to first raise the issue before the juvenile court. In any event, we are unpersuaded by the merits of mother's argument.

The juvenile court, after it announced its rulings at the January 9, 2014, hearing, asked if anyone had anything else to raise. Mother's counsel stated, "Yes, your Honor. I'd like to make a request that the visitation between my client, the mother, and her son, be as frequently as possible as arranged between the father and the mother, and that the father be the supervisor. [¶] My understanding is the [A]gency would also like to have as part of that condition that any visitation should take place outside the home of the father, and therefore, I'm requesting that we ask for the father and mother be able to arrange visitation with their son, for the mother, and that the father be the supervisor of those visits, and that the [A]gency have discretion to appoint an additional supervisor if it becomes necessary. [¶] I'm thinking of a family member, but I want the [A]gency to have discretion just in case."

10

The court responded, "So ordered." It asked if counsel had anything else and, when no one raised anything, adjourned the proceedings. Its minute order states that "[v]isits between the child & mother may be supervised by the father. Agency has discretion to appoint additional supervisors." The court did not issue any further order regarding mother's visitation rights.

On appeal, mother argues that the juvenile court erred when it ordered what her counsel requested, and nothing more. The Agency argues she has forfeited this appellate claim by failing to first raise an objection below. We agree. " 'A party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court. [Citations.] Forfeiture . . . applies in juvenile dependency litigation and is intended to prevent a party from standing by silently until the conclusion of the proceedings. [Citations.]' A party may not assert theories on appeal which were not raised in the trial court." (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 686.)[3] Our Supreme Court has cautioned that, although "application of the forfeiture rule is not automatic," "the appellate court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.)

We see no reason to excuse mother's forfeiture here. To the contrary, we are perturbed by mother's appeal from an order issued *exactly as mother's own counsel requested below*. Mother argues that, since visits had been occurring weekly at the time of the January 9, 2014, hearing, "[t]here was no reason for counsel to suspect that the court would not order that visits continue to occur" weekly. We do not agree, and mother does not establish that the court had a sua sponte duty to issue such an order. Indeed, this case involves a circumstance the forfeiture rule is designed to prevent: an appeal that could have been easily avoided by a few more moments of discussion before a court that was already amenable to mother's visitation requests.

---

**3** Mother argues that the facts in *In re Kevin R.* are inapposite. Whether or not this is the case, it is not relevant because we cite the case for its discussion of forfeiture law only.

Mother also argues that we should exercise our discretion to excuse any forfeiture because she raises an issue about a substantial right that affects the integrity of the proceedings. She contends that "[t]he lack of visitation to the former custodial parent when the child has been placed with the former noncustodial parent with services affects the integrity of the proceedings because a previously custodial parent cannot reunify with her child without visitation." This argument is unpersuasive because, as we will discuss, the court ordered that mother be allowed to visit A.M.

That is, even if we did not find forfeiture here, mother's argument is unpersuasive because it too relies on a false premise: that the juvenile court delegated to father the authority to determine if any visits between mother and A.M. would occur. To the contrary, the court ordered that mother be allowed visits with A.M. "as frequently as possible." It merely left the details about time, place, and manner to father and mother to arrange, and ordered that father supervise the visits.

Mother argues the court erred because "an order that merely states that visitation be as frequently as possible, supervised by the other parent, is an unlawful delegation of visitation to the other parent." However, she does not provide any persuasive legal support for this position. In the first of two cases on which she primarily relies, *In re T.H.*, the court stated that "[t]he power to determine the right and extent of visitation by a noncustodial parent in a dependency case resides with the court and may not be delegated to nonjudicial officials or private parties." (*In re T.H.* (2010) 190 Cal.App.4th 1119, 1123.) However, as mother acknowledges, *In re T.H.* also states that "[a] visitation order may delegate to a third party the responsibility for managing the details of visits, including their time, place and manner." (*Ibid.*; see *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1009 [most courts "agree the visitation order need not specify the frequency and length of visits"].)

In the second case that mother relies on, *In re E.T.*, the juvenile court delegated to a social services department the authority " 'to create [a] detailed written visitation schedule' " for a parent, and did not provide any further guidelines. (*In re E.T.* (2013) 217 Cal.App.4th 426, 439.) The appellate court concluded that "the visitation order must

12

give *some* indication of how often the visitation should occur." (*Ibid*., italics added.) That indication was provided here.

Mother also points out that the court's minute order does not specify that visits should occur as frequently as possible.  This is correct.  However, " 'whether the recitals in the clerk's minutes should prevail as against contrary statements in the reporter's transcript, must depend upon the circumstances of each particular case.' " (*People v. Smith* (1983) 33 Cal.3d 596, 599.)  We conclude that under the circumstances the juvenile court's oral ruling prevails to the extent it is inconsistent with the minute order. (See *In re Aryanna C.* (2005) 132 Cal.App.4th 1234, 1241, fn. 5 [juvenile court's oral statements about disposition controlled over the written order from the hearing].)  The court adopted mother's counsel's request that mother be allowed to visit with A.M. "as frequently as possible."  That is the order of the court.

In light of our conclusion, we do not address the parties' arguments regarding invited error or prejudice.

## DISPOSITION

The rulings appealed from are affirmed.

13

_____
STEWART, J.


We concur.


_____
KLINE, P.J.


_____
RICHMAN, J.