Filed 2/14/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re JAYDEN G., a Person Coming Under the Juvenile Court Law.<br><br>_____<br><br>LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>S.G.,<br><br>     Defendant and Appellant. | B321426<br><br>Los Angeles County<br>Super. Ct. No. 19CCJP00015A |

APPEAL from an order of the Superior Court of Los Angeles County, Charles Q. Clay, Judge.  Reversed.

Lori Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Interim County Counsel, Kim Nemoy, Assistant County Counsel, and Navid Nakhjavani, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Mother S.G. appeals after the juvenile court terminated her parental rights to son Jayden G. She raises two challenges. First, she faults the Los Angeles Department of Children and Family Services (DCFS) for failing to exercise due diligence in locating her son's father, Cesar T. (Father). Mother argues this failure to locate Father, which included ignoring information she provided on how to locate him, invalidated the notice the court deemed proper for Father. Second, she contends DCFS did not comply with its initial duty of inquiry under Welfare and Institutions Code section 224.2,[1] subdivision (b) when it failed to ask maternal and paternal extended family members about Indian ancestry within the meaning of Section 1903 of the federal Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.).

This dependency proceeding lasted over two years. In that time, DCFS made two attempts to locate Cesar T. and it did so using databased search resources only. It made no attempt to inquire about Indian ancestry after obtaining Mother's denial of such ancestry. We find DCFS did not exercise reasonable due diligence in its attempts to locate Father. We also find DCFS erred in determining that ICWA did not apply without inquiring of available family members for whom it had contact information. Because we must reverse and remand for proper notice to Father, we also direct the juvenile court to order DCFS to conduct and complete a proper inquiry into whether Jayden has Indian ancestry.

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

BACKGROUND

A.    *Notice to Father*

On January 2, 2019, DCFS filed a section 300 petition alleging Jayden (born 2011), his half-sister (born 2014) and his half-brother (born 2016) were at risk of physical harm, damage, danger and physical abuse because of Mother's physical abuse, Mother's failure to provide Jayden with his prescribed psychotropic medication after emergency psychiatric hospitalization in November 2018 and Mother's failure to supervise and protect Jayden who was found in a park in December 2018 without adult supervision and care.  Six days before the petition was filed, the juvenile court issued an order removing the children from Mother because of concerns about general neglect.[2]  Jayden was placed with a foster parent.

The reports prepared for the detention hearing concluded Cesar T.'s whereabouts were unknown.  They advised the court that "Mother reported Jayden's father is Cesar [C.].  He is not involved and is in jail."  In the same reports Mother stated Jayden's father is Cesar T.

At the January 3, 2019 detention hearing, Mother orally advised the court that Jayden's father is Cesar T. and he was currently incarcerated.  On the same date, Mother had also completed a Parentage Questionnaire in which she named Cesar Eduardo T. as Jayden's father.  She listed Cesar T.'s year of birth as 1977 and stated she believed he was in local custody.  At the hearing the court detained Jayden.  It also ordered DCFS to prepare a due diligence report on efforts to locate Cesar T. and the fathers of Jayden's half-siblings.  If the report was not filed

_____

[2]    This appeal concerns Jayden only.

3

before the adjudication hearing, DCFS was ordered to bring the dependency investigator in for the adjudication hearing.  On the record, the court itemized what was known about Father:  "Birth year of 1977," name  "Cesar Eduardo T.," "[h]e's in local custody," and  "February 11th for his arraignment from county jail."

The next hearing was the jurisdiction/adjudication hearing on February 22, 2019.  The jurisdiction/disposition report filed on February 8, 2019 advised the court that Mother lived with maternal grandmother and maternal aunt.  Mother stated she grew up with her mother with whom she has a good relationship.  She reported that she "broke up with Cesar [T.] due to his continued methamphetamine use, although she quit using when she found out that she was pregnant."

The report also indicated Cesar T.'s whereabouts were unknown.  According to the Los Angeles Sheriff's Department website, he was not incarcerated.

As ordered, DCFS filed a Declaration of Due Diligence cataloguing its efforts to locate Cesar T.  On January 29, 2019, DCFS had searched internet law enforcement and prison databases and AT&T telephone listings for the name Cesar T.  DCFS advised the court "A proper Due Diligence could not be completed without a date of birth."  DCFS reported it made no telephone calls, sent no letters, and contacted no relatives, friends, or neighbors.  The Declaration of Due Diligence confirmed that most databased sources of information were not useful because Cesar T.'s complete birthdate was unknown.  It appears DCFS did not use as leads the birth year of 1977, the middle name Eduardo, or the February 11 date of local arraignment.

A last minute information (LMI) report filed March 4, 2019 advised that mother came into the DCFS office on February 25, 2019, accompanied by maternal grandmother, maternal aunt, and maternal cousin. The LMI stated Mother disclosed Cesar T. was "not incarcerated anymore and that she saw him the day he got out of jail because his father lives on her street. Mother said she told [Cesar T.] about Jayden and the case and that [he] said he would go visit [maternal grandmother] to speak with her but never did." Mother stated she did not have "any of the fathers' numbers or DOB." The LMI also reported "A search of the [Sheriff's Department] website indicates no match to the [Cesar T.] father. The Department of Corrections website notes 3 matches per the father's name but the date of birth/age of father is unknown. However, Mother has reported that Father has been released from custody."

At the adjudication hearing on March 4, 2019, the court struck the allegations of physical abuse and Mother entered a no contest plea to the remaining allegations. The court found due diligence had been completed as to Jayden's father and his whereabouts were unknown. On March 5, 2019, the court found Jayden to be a dependent of the court, ordered him removed from Mother, and ordered reunification services for mother and monitored visitation. On May 1,2019 Jayden was placed with maternal cousin A.L. On that same date, the juvenile court signed an order finding Cesar T. to be Jayden's alleged father.

Eight months later, on January 3, 2020, DCFS filed a First Amended Petition with allegations of domestic violence between Mother and the newly located father of Jayden's half-brother. It also included allegations that Mother's 16-year history of illicit drug abuse rendered her incapable of regularly caring for and

supervising the children. On January 16, 2020, the court sustained the illegal drug abuse allegation.

On September 29, 2020, the court terminated reunification services for Mother, finding her case plan compliance unsatisfactory. After this point, all future hearings focused on permanency and adoption planning.

On November 20, 2020, DCFS prepared an updated Declaration of Due Diligence as to the search for Cesar T. The Declaration stated that "[n]o telephone calls were made or contact letters were mailed" to any relatives or friends or neighbors because there was "no information" about anyone falling into those categories. The Declaration ends with a Summary: "The efforts to locate Cesar [T.] were initiated through the State of California Department of Child Support Statewide Service (SWS), the LEADERS search, and the CWS/CMS search. Internet research was conducted through the Los Angeles County Sheriff's Department Inmate Information Center, the California Department of Corrections and Rehabilitation, the Los Angeles County Department of Probation, Federal Bureau of Prisons, Global-Locate.com, the AT&T telephone listings, the Service Members Civil Relief Act website, and the CLEAR search database. Contact letters were not sent to Cesar [T.], the respective Postmasters, or the Los Angeles County Registrar of Voters. A CLETS report was not searched via the Department of Justice for a criminal record. A birth certificate was attached, and did not list Cesar [T.] as the father of Jayden [G.]."

At the permanency planning hearing on January 20, 2021, the court noted that "[n]otice is not proper for today's hearing as we need publication orders." The court remarked that "the

6

search was done without benefit of a social security number or date of birth . . . . So no address was obtained as a result of the search. The due diligence is found proper and complete, and the court will now sign the publication orders."

At the next hearing on April 21, 2021, the court noted that notice to Father was still not as required by law. The court stated "[W]e need publication for Dad and a 75-day date."

On April 27, 2021 DCFS filed "Application for Order For Publication of Citation or to Dispense With Publication For Identity Unknown Parent Per WIC § 294 (For the WIC § 366.26 Hearing)." On April 27, 2021, the court granted the application and ordered publication of the citation in a newspaper of general circulation. The court also ordered that notice be given to all "Grandparents of the child, if their identities and addresses are known, by first-class mail." Publication was effectuated on April 30, May 7, May 14, and May 21, 2021 in the Daily Commerce.

However, the record does not show service by first-class mail on Jayden's grandparents, including Cesar T.'s father who, according to Mother, lived down the street from her. Instead, the status review report for April 19, 2022, states notice was given by first-class mail to only Mother, Jayden, and the prospective adoptive parent A.L. Actual proofs of service in the record for the permanency planning hearings also show service was effectuated on only Mother, Jayden, and the prospective adoptive parent A.L.

At the next hearing on July 21, 2021, the court asked the parties present whether there were objections to the notice DCFS had given. Mother, through counsel, stated she had no objection. On October 19, 2021, the court again reiterated "[G]ood notice to continue. On July 21st when the court found notice proper to parents."

7

On January 18, 2022, the court again asked the parties if anyone wanted to be heard regarding notice. Mother, through counsel, observed notice was previously found proper and proffered no objection to notice.

On April 19, 2222, the court found Jayden adoptable, terminated parental rights, and designated Jayden's current caretakers (A.L. and her partner) as his prospective adoptive parents. This appeal followed.

B.   *ICWA*

On January 3, 2019, Mother signed an ICWA-020 Form declaring under penalty of perjury that she had "no Indian ancestry" as far as she knew. At the initial detention hearing of the same date, the juvenile court found no reason to know Jayden is an Indian child as defined under ICWA and declined to order notice to any tribe or the Bureau of Indian Affairs. It advised the parents to keep DCFS, counsel, and the court aware of any new information relating to Jayden's status under ICWA. On January 24, 2019, Mother also orally denied Indian heritage. Father was never asked about ICWA as his whereabouts were always unknown.

## DISCUSSION

A.   *DCFS Failed to Conduct a Reasonable Due Diligence Inquiry as to Cesar T.'s Whereabouts.*

The Fourteenth Amendment to the United States Constitution provides: "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." (U.S. Const., 14th Amend., § 1.) Because parents have a fundamental liberty interest in the companionship, care, custody, and

8

management of their children, the due process clause requires child welfare agencies to exercise reasonable diligence in attempting to locate and notify them of dependency proceedings. (*In re J.R.* (2022) 82 Cal.App.5th 569, 572; *In re Mia M.* (2022) 75 Cal.App.5th 792, 807.)  This requires a thorough and systematic investigation to protect a parent's fundamental liberty interest.  (*In re Mia M.,* at p. 808.)

We review de novo whether inadequate notice violated a parent's due process rights.  (*In re J.H.* (2007) 158 Cal.App.4th 174, 183.)  Whether a due process violation in the dependency context is structural error requiring automatic reversal is an open question. (See *In re Christopher L.* (2022) 12 Cal.5th 1063, 1083 ["We express no view on the cases that have applied a rule of automatic reversal where there was a complete absence of notice."].)  In declining to address the issue, the Court noted "The Courts of Appeal that have addressed notice errors in the dependency context have attempted to draw a line between cases in which there was a complete deprivation of notice and cases in which there was some lesser defect as to the notice, with only the former requiring automatic reversal."  (*Id*. at p. 1082; see also, *In re Marcos G.* (2010) 182 Cal.App.4th 369, 387 [when there is no attempt to serve a parent with notice the error is reversible per se; when there is error in the notice the question is whether the error is harmless beyond a reasonable doubt]; *Ansley v. Superior Court* (1986) 185 Cal.App.3d 477, 483 ["It is settled beyond dispute that if a parent proves the absence of due process notice to him in juvenile dependency proceedings, a 'fatal defect' exists in the jurisdiction of the juvenile court to have entered the dependency judgment."]; *In re Mia M., supra*, 75 Cal.App.5th at

p. 806 ["An error in attempted notice is subject to a harmless beyond a reasonable doubt standard of prejudice."].)

Before we get to the merits of Mother's argument, we must address Cesar T.'s status as an alleged father.

### 1. Status as Alleged Father

On May 1, 2019, the juvenile court found Cesar T. to be an alleged father. Dependency law recognizes four categories of fathers—biological, presumed, alleged, and de facto. (*In re E.T.* (2013) 217 Cal.App.4th 426, 436–437.) Generally a presumed father is one who receives the child into his home and holds himself out as the child's father. (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 801–802.) A presumed father is also one who is married to the child's biological mother and the child is born during the marriage. (Fam. Code, § 7611, subd. (a).) A biological father is one whose paternity of the child has been established but who has not qualified as the child's presumed father under Family Code section 7611. An alleged father is a man who may be the father of the child, but whose biological paternity has not been established, or, in the alternative, has not achieved presumed father status. (*In re Kobe A.* (2007) 146 Cal.App.4th 1113, 1120.) "Due process for an alleged father requires only that he be given notice and an opportunity to appear and assert a position and attempt to change his paternity status." (*Ibid.*) Thus, Cesar T., as Jayden's alleged father, was entitled to notice and an opportunity to appear and participate in the dependency proceedings.

2.    Analysis of the Merits

In juvenile dependency proceedings, due process requires parents be given notice that is reasonably calculated to advise them that an action is pending and afford them an opportunity to defend.  (*In re Mia M.*, *supra*, 75 Cal.App.5th at p. 807.)  Reasonable diligence includes not only " ' "standard avenues available to help locate a missing parent," but " 'specific ones most likely under the unique facts known to the [Agency] to yield [a parent's] address." ' "  (*Id.* at pp. 807–808.)  "Social services agencies, invested with a public trust and acting as temporary custodians of dependent minors, are bound by law to make every reasonable effort in attempting to inform parents of all hearings. They must leave no stone unturned."  (*In re DeJohn B.* (2000) 84 Cal.App.4th 100, 102.)

Here DCFS had more to go on in searching for Jayden's father than just the name Cesar T. It had a middle name, a year of birth, and the information that Father had been arrested recently, had been in local custody, and had a specific court date. Significantly, it also knew Cesar T.'s own father lived down the street from Mother's residence.

Notwithstanding these facts, DCFS did nothing more than search certain computer databases, without exploring the more specific information provided by Mother, information the juvenile court expressly put on the record and exhorted DCFS to use when it ordered the due diligence report.  The most likely avenues for finding Cesar T.—for example, tracking down his father in a house located on the same street as Mother's residence, adding a middle name to differentiate Father from others with his same common combination of first and last names, using a birth year to narrow the pool of men with the name Cesar T., checking court

11

arraignment or LASD transport records for February 11 using his complete name—were ignored. This was not a reasonably diligent effort to locate Cesar T. Indeed, limiting searches to generalized databases where there is more localized and specific information from relatives has been found to be error in numerous cases. (*In re D.R.* (2019) 39 Cal.App.5th 583 [relying on government database searches when children were in contact with father through social media]; *In re Daniel F.* (2021) 64 Cal.App.5th 701 [limiting search to U.S. databases when relatives told the agency father was in Mexico]; *In re Mia M.*, *supra*, 75 Cal.App.5th 792 [running standard California and federal databases when family told agency father lived in Oklahoma].)

Even publication does not save this search. DCFS published notice for Father in a newspaper of general circulation, the Daily Commerce. However, service by publication will not satisfy due process if it is not the most likely means of notifying the parent. (*In re Mia M.*, *supra*, 75 Cal.App.5th at p. 808–809.) Given the localized search alternatives described above, we cannot find that publication by notice fulfilled DCFS's duty of due diligence.

### 3. Prejudice

Assuming *Chapman v. California* (1967) 386 U.S. 18 applies, we find DCFS's formulaic search for Cesar T. was not harmless beyond a reasonable doubt. Because Father had inadequate notice of the proceedings, he was unable to exercise his right to come into court and assert his position with respect to Jayden. It is not reasonable to assume Cesar T. would never have appeared anyway, as Respondent argues. We do not know if he truly failed to call maternal grandmother as he said he would

12

because DCFS did not follow up on that lead.  There is no evidence to suggest Cesar T. would have nonetheless failed to assert his rights had he been given notice.  The error was not harmless beyond a reasonable doubt.

B.    *DCFS Failed to Conduct an Adequate Initial Inquiry into Jayden's Indian Ancestry.*

Where, as here, the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied.  (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1051.

In enacting the federal Indian Child Welfare Act (ICWA), Congress found "that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions." (25 U.S.C. § 1901(4).)  ICWA reflects the intent of Congress "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs."  (25 U.S.C. § 1902.)  The court is obligated to ask each "participant" in the proceedings whether they have reason to believe the child is an Indian child and to instruct the parties to inform the court if they subsequently receive information that provides a reason to know the child is an Indian child.  (*In re Austin J.* (2020) 47 Cal.App.5th 870, 882–883.)

13

ICWA authorizes states to provide even more protection than the federal statute provides.  In 2006, the California legislature enacted parallel statutes to affirm ICWA's purposes and mandate compliance with ICWA in all Indian child custody proceedings.  (*In re K.R.* (2018) 20 Cal.App.5th 701, 706, fn. 3.)  In California, the child protection agency is obligated to ask "the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child."  (§ 224.2, subd. (b).)  The child protection agency, in this case DCFS, must complete the Indian Child Inquiry Attachment form ICWA-010(a) and attach it to the petition.  (Cal. Rules of Court, rule 5.481(a)(1).)

Here, DCFS did not ask the maternal and paternal extended family members about their Indian ancestry, despite having contact with maternal grandmother, maternal aunt, and maternal cousin and information about paternal grandfather's residence.  This was a violation of California law.

Ordinarily the next question is whether the error was prejudicial.  A prerequisite to reversal of a trial court's decision in California is showing a miscarriage of justice.  (Cal. Const., art. VI, § 13.)  However, because we must remand the matter in any event to effectuate a complete and diligent search for Cesar T., we also direct the juvenile court to ensure that DCFS completes its duty of initial inquiry by asking available maternal and paternal relatives about Indian ancestry.

C.    *Reversal Is Warranted as to Both Parents*

Given the combination of due process notice violations and ICWA error, we exercise our discretion to conditionally reverse the orders terminating parental rights for both Mother and

Father.  (*In re J.R.*, *supra*, 82 Cal.App.5th at p. 573.)  Nothing in our opinion requires the juvenile court to revisit its prior rulings as to Mother unless new facts arising from the investigations on remand into Cesar T.'s whereabouts and Jayden's Indian ancestry impact the bases of its prior decisions.

## DISPOSITION

The order terminating parental rights is conditionally reversed with direction to the juvenile court to order DCFS to complete its duty of due diligence to discover the whereabouts of Cesar T. and complete its initial inquiry of available maternal and paternal relatives into familial Indian ancestry.

## CERTIFIED FOR PUBLICATION

STRATTON, P. J.

We concur:

GRIMES, J.

WILEY, J.

15