Filed 9/21/20 In re Rubi C. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re RUBI C., a Person Coming Under Juvenile Court Law. | B301266 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 19CCJP01175C) |
| Plaintiff and Respondent, | |
| v. | |
| C.C., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Craig S. Barnes, Judge. Affirmed.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, Mary C. Wickham, County Counsel, Kristine P. Miles, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

---

## INTRODUCTION

Appellant C.C. is the father of minor Rubi C. (born February 2016). Sandra C. is Rubi's mother. In October 2018, C.C. had been in a relationship with Sandra for eight years (married for four), during which time he had helped raise her two children, Dayana C. (born February 2006) and Fernando C. (born April 2004). In the proceedings below, after finding that C.C. had sexually abused Dayana, the court removed Rubi from his custody, placed her with Sandra, and ordered him to stay away from Dayana and the family home. In this appeal, C.C. contends that substantial evidence does not support the court's jurisdictional or dispositional orders, and that the court could have employed alternate means short of removal to protect Rubi. Finding no error, we affirm.

## STATEMENT OF RELEVANT FACTS

### A.   *Dayana Accuses C.C. of Sexual Abuse*

On October 18, 2018, a teacher saw 12-year-old Dayana "sobbing" while being comforted by two friends. She had told these friends that C.C. had been sexually abusing her, and

2

they urged her to tell the school counselor. Dayana did, and the counselor reported the accusation to the principal, who in turn reported it to the police. While the principal waited with Dayana for the police to arrive, Dayana told her about the abuse. The principal later reported that Dayana was very emotional during this time, "had a meltdown for 45 minutes," and was "sobbing uncontrollably." When two male police officers arrived, Dayana refused to go with them to the station, and the principal agreed to take Dayana in her own car. On the drive, Dayana reiterated the abuse allegations, telling the principal that C.C. had been touching her thighs and "every private part" at home or in the car when no one else was present. According to the principal, Dayana reported the abuse began about two years earlier when she entered puberty.

The Department of Children and Family Services (DCFS) was alerted by the police, and a children's social worker (CSW) spoke with Dayana at the police station. Dayana stated that she lived at home with her brother Fernando, her stepsister Rubi, her mother Sandra, and her stepfather C.C. C.C. had been in Dayana's life since she was very young and, because he took on a fatherly role, she thought of him as her father and called him her father. She reported that, starting approximately a year ago, C.C. had begun touching her in ways that made her uncomfortable. The first such instance occurred halfway through the sixth grade, when C.C. hugged her from behind, placing his hand

3

on her stomach, and then kissing her on the cheek.[1]  After that day, he began giving her these "weird" hugs, as well as touching her over her clothes, squeezing her breasts, and touching and slapping her buttocks.  On one occasion, he had her sit on his lap for five minutes, though she did not want to.  In a recent incident, C.C. insisted Dayana lay in bed with him, threatening to tell Sandra that she was being disobedient if she refused.  Though the rest of the family was in the home when the lap-sitting incident occurred, and Rubi was in the home when the bed incident occurred, no one saw anything, and C.C. told her not to tell her mother.

Dayana stated that the previous day, C.C. had told Sandra Dayana was being disobedient, and Sandra reacted by taking Dayana's phone away, causing her to run crying to the bathroom.  After Sandra told her to come out, Dayana responded that her mother "did not know everything that was going on."  When Sandra responded that Dayana needed to listen to C.C., Dayana became angry and told her mother that C.C. had been touching her body.  Sandra told C.C. to take the other children to school, kept Dayana at home, and asked her what she wanted to do, giving her the option of talking to law enforcement or setting up cameras in the home to catch C.C. in the act.  Dayana said she did not know what she wanted.  After C.C. returned that afternoon, Sandra spoke with him, and C.C. did not speak with Dayana for the rest of the night.  Dayana believed she was now safe

---

[1]	Dayana was in the seventh grade at this time.

in her home because Sandra had told C.C. not to touch her again. The next day at school, when asked by a friend why she was absent, Dayana revealed the abuse, and was encouraged to disclose it; Dayana then told a school staff member.

At the police station, after the CSW finished her interview with Dayana, Dayana repeatedly asked whether C.C. would be arrested. When the CSW stated she did not know, Dayana began to cry and said she did not want C.C. arrested and expressed regret in disclosing the allegations.

The CSW spoke with Sandra and Fernando later that day. Sandra confirmed she had taken Dayana's phone away the previous morning because Dayana was not listening to either C.C. or her. Sandra also confirmed Dayana had told her that she (Sandra) "did not know everything that was going on." Sandra claimed, however, that Dayana had reported only that C.C. had touched her shoulder area, and had denied C.C. ever touched her on the breasts or buttocks, or had done anything else. Sandra denied ever seeing C.C. behave in a sexualized way with Dayana or any of the other children. She also stated she had asked C.C. about Dayana's allegations, and he had denied ever abusing her, instead reporting that Dayana had previously told him she would "say things about him" if Sandra took away her phone. Fernando, who, like Dayana, thought of C.C. as his father, indicated he felt safe with C.C.

Later that day, the CSW called C.C., who denied the allegations, but declined to speak in person with the CSW, because he had retained an attorney.

## B.  *Dayana Recants*

On October 20, 2018, Sandra left a voicemail for the CSW, informing her that Dayana had recanted and stated that she had invented the allegations because she was upset with C.C.  The CSW visited the home on October 24 and Sandra informed the CSW that on October 20, Dayana had been crying all day, and told Sandra she had lied, and "did not think that it was going to turn out this way."  Sandra reported Dayana had asked why C.C. had not returned home, and when Sandra stated it was to protect Dayana, Dayana cried harder and stated she had lied because she was mad at him.  Sandra believed Dayana invented the allegations "but still ha[d] uncertainty."  She also relayed that Dayana had spoken with C.C. on the phone to ask for forgiveness, and that Fernando was angry at C.C.'s absence.  She agreed to have Dayana undergo a forensic interview and exam.

In a private conversation with the CSW, Dayana apologized, claiming to have invented the allegations.  She stated that when she woke up Saturday morning (i.e., October 20), she realized her lie was affecting her family "way more than she hoped," noting C.C. had not been home and Rubi had asked about him.  Dayana claimed she fabricated the story because she was upset with the way C.C.

ordered her around, and because he told Sandra to take her phone away when she was disobedient. She also said she was angry over her lack of a relationship with her biological father. She repeatedly denied that anyone told her to recant, but stated she did not want C.C. to be arrested, or for Rubi to grow up without a father. Dayana also agreed to a forensic interview and exam.

In November 2018, the CSW spoke with the principal at Dayana's school, who stated she believed Dayana's initial disclosures were genuine. The principal noted that Dayana had never recanted the allegations to her, but instead had made comments about how she (Dayana) had "'ruined everything'" and "'should have not said anything.'"

In December 2018, the CSW again met with Sandra and the children. Sandra reported C.C. had returned home a few days before Thanksgiving, and things were going well. Sandra stated she had not left Dayana in C.C.'s care because although they were interacting well, Sandra still had some uncertainty as to what had happened. Dayana confirmed Sandra took her everywhere she went, even if Dayana preferred to stay home.

In January 2019, DCFS received a call from the forensic examiner, confirming Dayana had recanted her abuse allegations. The examiner cautioned, however, that Dayana's recantation did not mean the abuse did not occur. One week later, the CSW made a follow-up visit; Sandra and Dayana reiterated everything was fine, and there were no

issues with C.C., but Sandra was still not leaving Dayana alone with C.C.

### C.   *Charges Are Filed Against C.C.*

The police conducted their own investigation, speaking with Dayana's two friends, the school counselor, and the principal. Dayana's friends stated she had been upset that morning and told them she had been sexually abused by C.C. The counselor stated Dayana had come in with two friends, seemed "'very on edge' as if she did not want to be there," and was crying. At the urging of her friends, Dayana told the counselor C.C. had been touching her inappropriately, and that she had told her mother, but was scared that her mother was upset.

The principal stated she had learned of the abuse from the school counselor, and that Dayana had been very emotional while they waited for the police to arrive. When she checked in on Dayana several days later, Dayana said her brother was upset with her for making a report and was no longer speaking to her. She "'broke down crying'" and stated she wanted to take it all back because Fernando was mad, and she did not want Rubi to grow up without a father. She also did not want her mother to be stressed out and to struggle financially. Dayana stated that if anyone asked her about the allegations, she would say she had fabricated them.

DCFS learned that the City Attorney had watched the video of the police interviewing Dayana and stated her

8

"affect was concerning" and appeared to indicate she was credible. On February 19, 2019, child abuse charges were filed against C.C. He originally entered a plea of not guilty but in May 2019, changed his plea to "no contest" to two of the charges as part of a plea bargain.[2]

### D. *DCFS Removes the Children and Files a Petition*

A day after criminal charges were filed, the juvenile court issued a removal order, and DCFS detained the children. Two days later, DCFS filed a petition under Welfare and Institutions Code section 300, subdivisions (b)(1), (d), and (j) (Sections 300(b)(1), 300(d), and 300(j), respectively). Each count identically alleged that: "On prior occasions . . . [C.C.] sexually abused . . . Dayana by fondling the child's breasts, buttocks, thighs and inner legs. [C.C.] hugged the child from behind making the child uncomfortable. [C.C.] forced the child to lay in bed with [him]. [C.C.] would have the child sit on [his] lap. [C.C.] told the child not to tell the mother about the sexual abuse. The mother knew or reasonably should have known of the sexual abuse of . . . Dayana by [C.C.] and failed to protect the child by allowing [C.C.] to reside in the home with the child. The mother reported that she believes [C.C.]'s assertion that he

---

[2]    In a later motion to withdraw his plea, C.C. claimed his attorney had pressured him to accept the offer. At the time the instant case was adjudicated, the motion to withdraw was still pending.

did not sexually abuse the child. Such sexual abuse of the child by [C.C.] and the mother's lack of protection of the child, endanger . . . Dayana's physical health and safety and place the child and the child's siblings, Fernando and Rubi[,] at risk of serious physical harm, damage, danger, sexual abuse and failure to protect." Fernando (then 14 years old) and Rubi (then three years old) were named in all three counts, and Dayana (then 13 years old) was named in the counts under Sections 300(b)(1) and (d).

After C.C. and Sandra denied the petition, the court found a prima facie case for detaining the children, and placed Rubi in shelter care. Because of the criminal charges filed against C.C., at C.C.'s request, the court ordered DCFS not to interview him.

### E.    *DCFS Continues to Investigate; Dayana Continues to Deny Abuse Occurred*

In March 2019, a dependency investigator interviewed Dayana, who continued to claim she had fabricated the initial allegations because she was angry at C.C. She stated she had thought making the allegations would force C.C. to leave the home, but did not realize it was going to be a "big, big, big problem." Sandra maintained she did not believe C.C. had abused Dayana because Dayana had recanted the allegations.

In its April 2019 report, DCFS concluded that "[a]t this time, it is the assessment of DCFS as well as that of Law Enforcement, that . . . Dayana's original disclosure of abuse

10

was truthful, and that the child recanted only after seeing the results of her disclosure to include disrupting her family and upsetting her mother, which the child appears to regret." DCFS therefore recommended the children remain detained from their parents.

**F.    *The Court Finds Jurisdiction and Removes Rubi***

On August 1, 2019, the court held the adjudication and disposition hearings. After the court found C.C.'s conviction and plea inadmissible due to the pending motion to withdraw his plea, Dayana testified in chambers that she had fabricated the abuse allegations because she was mad at C.C. for telling her to do chores. She also testified she wanted to go home, and be with her entire family, including C.C.

DCFS argued the court should find jurisdiction despite Dayana's recanting, pointing to her initial disclosure, the implausibility of Dayana's invention of a detailed story of abuse due to something "as minor as" being told to do chores and having her cell phone taken away, and Dayana's motivation to recant so she could return home and make everything go away. Rubi's counsel joined DCFS in arguing the court should find jurisdiction, noting that Dayana's initial disclosures were detailed and consistent and were made to multiple parties -- including her friends, her mother, the school principal, law enforcement, and the CSW. The reported abuse had occurred over a period of time and

11

Dayana's behavior was consistent with that of an abuse victim. Rubi's counsel also argued that the child's biological relationship with C.C. did not insulate her from risk, because C.C. had been in Dayana's life since she was approximately five years old and acted as her father, yet still abused her. The remaining four counsel (representing Fernando, Dayana, Sandra, and C.C.) all asked the court to dismiss the petition because Dayana had recanted, and they did not believe the abuse had occurred.

The court, expressly recognizing that "these are not easy cases," emphasized that it "went through this with a fine-tooth comb to make sure that those scales had the evidence properly on each side to see if the burden had been met, recognizing that Dayana has recanted; recognizing, as well, that there are a whole host of reasons why a child may recant." The court sustained the petition as to Dayana, concluding that abuse had occurred despite her recanting, noting her consistency in describing the abuse and precision in describing the parts of her body that were touched, her emotion in making the allegations, and her lack of exaggeration.

Regarding Rubi, while the court initially expressed doubt whether she was at risk, it ultimately sustained the petition as to her because she was of the same sex as Dayana, and C.C.'s status as a father figure to Dayana had failed to protect her from abuse.[3] The court removed Rubi

---

[3] The court dismissed the petition as to Fernando.

from C.C., released her to Sandra under DCFS supervision, and ordered C.C. to stay away from both Dayana and the family home. C.C. appealed the next day.

On February 3, 2020, two days before C.C. filed his opening brief, the court awarded joint legal custody of Rubi to Sandra and C.C., but awarded physical custody only to Sandra, granting C.C. supervised visits for a minimum of six hours per week. It then terminated jurisdiction.

## DISCUSSION

### A. *The Appeal Is Not Moot*

Though DCFS urges us to find C.C.'s appeal moot because the juvenile court has terminated the dependency action, "the question of mootness must be decided on a case-by-case basis." (*In re Joshua C.* (1994) 24 Cal.App.4th 1544, 1547.) Termination of a dependency action "should not preclude review of a significant basis for the assertion of jurisdiction where exercise of that jurisdiction has resulted in orders which continue to adversely affect appellant. If the jurisdictional basis for orders restricting appellant's visitation with, and custody of, [a minor] is found by direct appeal to be faulty, the orders would be invalid. Moreover, refusal to address such jurisdictional errors on appeal by declaring the case moot has the undesirable result of insulating erroneous or arbitrary rulings from review." (*Id.* at 1548.) Here, the court's custody order granted sole physical custody of Rubi to Sandra and provided C.C. with

13

only limited, monitored visitation. This order continues to adversely affect C.C. If the jurisdictional basis for that order was found to be faulty, the order would be invalid. We therefore consider C.C.'s appeal on the merits.[4]

### B. *The Court Did Not Err in Finding Jurisdiction*

"'[W]e review both the jurisdictional and dispositional orders for substantial evidence. [Citation.] In doing so, we view the record in the light most favorable to the juvenile court's determinations, drawing all reasonable inferences from the evidence to support the juvenile court's findings and orders. Issues of fact and credibility are the province of the juvenile court and we neither reweigh the evidence nor exercise our independent judgment. [Citation.] . . . 'The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record.'

---

[4] The cases DCFS cites in support of its argument are distinguishable. (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1488-1489 [appeal moot because family law exit order granted mother the relief she sought through her appeal]; *In re Dani R.* (2001) 89 Cal.App.4th 402, 404-406 [appeal on substantial evidence grounds regarding lack of services provided to Mother moot when juvenile court subsequently provided the requested services and parents stipulated to express findings admitting the orders were supported by substantial evidence]; *In re E.T.* (2013) 217 Cal.App.4th 426, 436 [appeal of order granting custody to biological father not moot even though juvenile court subsequently removed minor from his custody because "allowing the court's order to stand may have collateral consequences"].)

14

[Citation.]" [Citation.]'" (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 560.)

### 1. *Substantial Evidence Supports the Jurisdictional Order*

The court found Rubi to be a dependent under Sections 300(b)(1), 300(d), and 300(j). "When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.) Because we conclude substantial evidence supports the court's jurisdictional findings under Section 300(j), we need not consider whether the jurisdictional findings under Sections 300(b)(1) or 300(d) are also supported.

Under Section 300(j), the court has jurisdiction if: (a) "[t]he child's sibling has been abused or neglected, as defined in subdivision . . . (d)"; and (b) "there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions." (Section 300(j).) Here, substantial evidence supports both that Rubi's half-sister Dayana was abused as defined in Section 300(d) (providing that a minor can be found to be a dependent if "[t]he child has been sexually

15

abused . . . by . . . a member of his or her household"), and that Rubi was at substantial risk of suffering the same abuse.

### (a) *Substantial Evidence Supports the Court's Finding That Dayana Was Abused*

Though Dayana claimed to have fabricated the abuse allegations because she was angry at C.C. and initially wanted him to leave, the first people she told after her mother were her two friends, who had no power to compel any action regarding C.C.; Dayana told the school counselor only at their urging. She repeated the allegations thereafter to the school principal, law enforcement, and the CSW. As the court noted, Dayana was precise in describing the parts of her body that were touched and consistent in describing the types of abuse, without the exaggeration often associated with fabrications. Dayana was very emotional during the disclosure, and she recanted only after realizing that C.C. had not come home, that Fernando was angry with her, and that Rubi had asked where C.C. was. Dayana also revealed she did not know her disclosure would lead to a "big, big, big problem," and she was worried about both her mother's stress at financially supporting the family without C.C., and Rubi's growing up without a father. As other courts have noted, "child victims of sexual abuse frequently recant their allegations." (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1148 [summarizing testimony from expert on child sexual abuse].)

On these facts, we find ample evidence to support the court's finding that Dayana's original allegations of abuse by C.C. were true, and that she recanted only because she was distraught over the resulting consequences of her reporting such abuse.

**(b)** ***Substantial Evidence Supports the Court's Finding That Rubi Was at Risk***

"[A]ppellate courts have rarely if ever been faced with a situation in which a father sexually molests one female minor in the household and the juvenile court does not find another female minor in the household to be at risk. The cases cited categorically state that aberrant sexual behavior directed at one child in the household places other children in the household at risk, and this is especially so when both children are females." (*Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 970 (*LACDCFS*).) C.C. argues the court erred in finding jurisdiction because both the "magnitude" and likelihood of abuse was low. We disagree.

We find *In re Andy G.* (2010) 183 Cal.App.4th 1405 (*Andy G.*) instructive. There, the juvenile court found that two-year-old Andy's father had sexually abused Andy's half-sisters (aged 12 and 14), who were not his biological daughters. (*Id.* at 1407.) Specifically, he fondled one girl's breast and exposed her to pornography and masturbated in her presence; he fondled the other's vagina and exposed his

17

penis to her (the last incident occurring while Andy was in the same room). (*Id.* at 1408.) As a result, the court assumed jurisdiction over Andy, and removed him from his father. (*Id.* at 1410.) The Court of Appeal upheld the orders, finding that "'aberrant sexual behavior by a parent places the victim's siblings who remain in the home at risk of aberrant sexual behavior.'" (*Id.* at 1414, quoting *In re P.A.* (2006) 144 Cal.App.4th 1339, 1347 [affirming a juvenile court order removing two boys from a father who was found to have sexually abused his daughter].)

Like the father in *Andy G.*, C.C. was also found to have abused two-year-old Rubi's 12-year-old half-sister who was not his biological daughter. Moreover, at least two incidents of abuse occurred when Rubi was in the home. While the abuse in *Andy G.* was more severe than the abuse in this case, the likelihood of abuse is greater because Rubi is the same sex as the victim, whereas the minor in *Andy G.* was of the opposite sex. Additionally, C.C. abused Dayana even though he had raised her since she was five years old and Dayana considered him her father, suggesting a parental bond with C.C. would not prevent abuse. On this record, substantial evidence supports the court's finding of substantial risk to Rubi.

### C. *C.C.'s Arguments to the Contrary Are Unavailing*

C.C. proffers four arguments why Rubi "did not fall within the parameters of the 'at risk' categories established

18

by the appellate courts of this state," citing several cases. We note preliminarily that none of the cited cases suggests the factors discussed constitute the sole basis for affirming a finding of jurisdiction. Nevertheless, we address each of his arguments below.

First, C.C. argues that Rubi was not "similarly situated" to Dayana because Rubi was three years old at the time of the hearing, and was C.C.'s biological daughter, whereas Dayana was 12 when she reported the abuse, and was not C.C.'s biological daughter. But the Court of Appeal has held that a seven- or eight-year difference between an abused sibling and a minor may support removal.[5] (*In re Ana C.* (2012) 204 Cal.App.4th 1317, 1319-1320, 1325, 1332 [affirming jurisdiction over minor who was three or four years old at the time of hearing, based on finding that minor's father had begun sexually abusing his stepdaughter when she was 10 or 11 years old].) Moreover, any "distinction between a stepdaughter and a biological daughter is contrary to the holdings and language of the cases that suggest sexual abuse of one child in the household puts at risk other children in the household." (*LACDCFS*, *supra*, 215 Cal.App.4th at 970.) This is especially so here, as

---

[5]     Dayana alleged that C.C. began abusing her when she was in the sixth grade, or when she was 11 years old.

19

C.C. had raised Dayana as a daughter since she was five, and she thought of him as her father.[6]

Second, C.C. argues there was no evidence Rubi was ever directly exposed to any acts of sexual abuse. But there was evidence that for at least two of the incidents of abuse, Rubi was in the home. As in *Andy G.*, Rubi's presence while the abuse occurred demonstrated "at best, a total lack of concern for whether [the minor] might observe [father's] aberrant sexual behavior" and was further evidence supporting a finding of jurisdiction. (*Andy G.*, *supra*, 183 Cal.App.4th at 1414.)

Third, C.C. argues that except for his abuse of Dayana, there was no evidence he engaged in inappropriate behavior with Rubi. But "'[t]he court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.'" (*In re I.J.* (2013) 56 Cal.4th 766, 773; see also *In re D.G.* (2012) 208 Cal.App.4th 1562, 1573 [where father was found to have sexually molested D.G., who was not his biological daughter, finding of jurisdiction over L.C. was affirmed, though L.C.

---

6   *In re Luis H.* (2017) 14 Cal.App.5th 1223, cited by C.C., is inapposite. In *Luis H.*, the issue was whether the evidence in the juvenile court "'was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support"'" the court's dismissal of the petition. (*Id.* at 1227.) Here, the issue is whether sufficient evidence supports a finding of jurisdiction.

was his biological daughter, and "he did nothing inappropriate to L.C."].)

Finally, C.C. argues that aside from the criminal charges filed in connection with his abuse of Dayana, C.C. had no history of criminal or sexual misconduct. Regardless, no authority holds that a lack of criminal history overcomes other evidence.

### D. *The Court Did Not Err in Removing Rubi from C.C.*

We review the dispositional order for substantial evidence. (*In re Joaquin C.*, *supra*, 15 Cal.App.5th at 560.) C.C. argues the court erred in removing Rubi from him because the jurisdictional order was erroneous and because there was insufficient evidence of risk to Rubi, as there was no evidence he had ever abused her, and Dayana had recanted. He also argues the court could have permitted him to live with Rubi "subject to stringent conditions of supervision, in-home counseling, and unannounced visits" and/or "conditioned [his] physical custody of Rubi upon his continued engagement in sex abuse and individual mental health counseling."[7] As explained above, the court did not

---

[7]     C.C. additionally argues the court erred by failing to follow Welfare and Institutions Code section 361, subdivision (e), by explicitly stating the facts supporting its conclusion that reasonable efforts were made to prevent Rubi's removal. Though C.C. admits he "did not specifically object to the court's failure to make the requisite factual findings under section 361, subdivision (e)," citing *In re Rebecca S.* (2010) 181 Cal.App.4th *(Fn. is continued on the next page.)*

21

err in finding jurisdiction, and substantial evidence supports the court's finding that Rubi faced a substantial risk of sexual abuse. Nor would the alternate means proposed by C.C. have effectively protected Rubi.

Supervision and unannounced DCFS visits would be inadequate to protect Rubi. In *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2006) 145 Cal.App.4th 692, our colleagues in Division Seven issued a writ of mandate ordering a juvenile court to vacate its order permitting a father who had molested his son to return home "on the condition his contact with [his son] be monitored at all times." (*Id.* at 698.) Division Seven found that "when the threat to the dependent child is the likely recurrence of sexual abuse, the concept of monitored visitation is fundamentally incompatible with around-the-clock in-home contact." (*Id.* at 699.) While Rubi had not been abused, the same reasoning applies: the type of abuse Dayana endured --

_____

1310, he argues this is a question of law and not subject to forfeiture. As *Rebecca S.* recognized, "'[A] reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court. [Citation.] The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected. [Citation.]'" (*Id.* at 1313, quoting *In re S.B.* (2004) 32 Cal.4th 1287, 1293.) While we have discretion to consider C.C.'s argument, we decline to do so because (a) a timely objection would have easily permitted the juvenile court to state the requisite findings; and (b) as we find below, no means short of removal would have adequately protected Rubi.

22

and that Rubi was at risk of suffering -- was not the type that would leave a physical trace; Rubi's contact with C.C. would therefore need to be monitored at every moment, which would be impossible. Moreover, due to the juvenile court's order that he stay away from Dayana, C.C. was not living in the family home. Had the court not removed Rubi from his custody, Rubi presumably would have been spending time alone with C.C. in a separate residence, without her mother or other siblings to look after her. This would have placed Rubi at greater risk. (See *LACDFS*, *supra*, 215 Cal.App.4th at 970 ["The changes in the family circumstances have also placed K.R. at greater risk. Currently, father is not living with mother. This places K.R. at greater risk without juvenile court jurisdiction because, absent juvenile court supervision, K.R. could be spending time alone with father away from mother's home, thereby providing greater opportunity for sexual abuse. The object of his predatory actions, N.C., is no longer available to him"].) Nor would conditioning C.C.'s custody of Rubi on participation in therapy be useful, because C.C. consistently denied having abused Dayana and "[o]ne cannot correct a problem one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.)[8]

---

[8]    The cases C.C. cites are distinguishable. (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 147-148 [reversing order removing minor where there was no evidence parents were the perpetrators of the physical abuse, and unlike the physically abused sibling, minor was articulate and had regular contact with mandated
*(Fn. is continued on the next page.)*

23

**DISPOSITION**

The juvenile court's orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.**


MANELLA, P. J.


We concur:


WILLHITE, J.                                    CURREY, J.

---

reporters]; *In re Henry V.* (2004) 119 Cal.App.4th 522, 529-530 [reversing order removing minor where it was unclear juvenile court had employed "clear and convincing" standard, where social worker had suggested "out-of-home placement [of the minor] would be useful to secure [mother]'s further cooperation," and where DCFS "acknowledged that in-home bonding services were available, and that unannounced visits and public health nursing services were potential methods of supervising an in-home placement, [thus] . . . mitigat[ing] the risk of further physical abuse"]; *In re Ashly F.* (2014) 225 Cal.App.4th 803, 810 [reversing order removing minors where Mother had expressed remorse and was enrolled in a parenting class, Father had completed a parenting class, and the court failed to consider reasonable alternate means of protecting the children such as unannounced visits by DCFS, public health nursing services, in-home counseling services, and removing Mother from the home]; *In re A.E.* (2014) 228 Cal.App.4th 820, 822 [reversing order removing minor where abuse was a single instance of "spanking [the minor] with a belt on her legs and buttocks" and Father was "remorseful and . . . committed to learning better childrearing techniques"].)

24