Filed 10/30/23  In re L.M. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re L.M. et al, Persons Coming Under the Juvenile Court Law. | B320963 consolidated with B322275 <br><br> (Los Angeles County  Super. Ct. Nos.  22LJJP00125  22LJJP00125A-B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> A.M. et al., <br><br> Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Donald A. Buddle, Jr., Judge.  Affirmed.

Megan Turkat-Schirn, under appointment by the Court of Appeal, for Defendant and Appellant A.M.

Jacques Alexander Love, under appointment by the Court of Appeal, for Defendant and Appellant W.M.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Jessica Buckelew, Deputy County Counsel, for Plaintiff and Respondent.

---

## INTRODUCTION

Mother A.M. and father W.M. challenge juvenile court jurisdiction and disposition orders involving their infant twins, L. and S.  The juvenile court exercised jurisdiction over the twins under Welfare and Institutions Code section 300, subdivisions (a) and (b),[1] based on findings relating to mother and father's domestic violence, mother's substance abuse and mental health issues, and father's failure to protect the children.  The juvenile court removed the children from the parents' care.

Mother challenges the jurisdiction order, contending substantial evidence does not support the juvenile court's ruling on any grounds.  We find that substantial evidence supports jurisdiction on the basis of domestic violence, and because jurisdiction over the children can be affirmed on that basis, we do not address mother's additional contentions.

Father challenges the disposition order, contending substantial evidence does not support the juvenile court's finding that the children should be removed from father's custody.  We find that substantial evidence of the parents' domestic violence

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

supports this order as well. We therefore affirm the juvenile court's jurisdiction and disposition orders.

Finally, father challenges the juvenile court's finding that the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA) did not apply. Father asserts that the Los Angeles County Department of Children and Family Services (DCFS) failed to comply with ICWA requirements. The juvenile court has since ordered DCFS to comply with ICWA, and we therefore find father's ICWA contention moot.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A. Detention**

The family came to the attention of DCFS from an emergency response referral in February 2022 stating that mother had engaged in domestic violence against father in the presence of the infant twins, who were born in November 2021. The reporter stated that father was afraid to report mother's domestic violence for fear that the children would be taken away. The reporter stated that there were "incidents of father having the children in his arms while mother beats him. Father will put up his arms to prevent mother from physically harming the babies. [The reporter] reports that if father were not putting up his arms, mother would likely be hitting the babies." The reporter stated that mother also kicks father while he's holding the children, and the babies cry when the violence is occurring.

When children's social workers (CSWs) went to the family residence on February 24, 2022 to investigate, mother met them outside. She told the CSWs that there had been no domestic violence; she and father only had a verbal argument. Mother's mother (maternal grandmother) was present; she also stated that there had been no domestic violence. Maternal grandmother

3

advised mother not to answer questions, stating that everything she said would be used against her. Maternal grandmother refused to give her name to the CSWs or answer their questions.

Mother initially resisted allowing the CSWs inside to see the children, but changed her mind after the CSWs told her they could get an investigation warrant. The babies appeared healthy and showed no visible signs of abuse or neglect.

The CSWs observed a bong and cigarettes on the front steps. Mother admitted she smokes marijuana, and that she had smoked marijuana that day while she and the children were outside. Mother also said she had smoked marijuana while she was pregnant. She agreed to take an on-demand drug test. Mother stated that father drinks alcohol, but she said he does not get aggressive or violent when he drinks. Mother denied any mental health issues.

Mother continued to deny all domestic violence allegations, including the report that she was violent toward father while he was holding the children. Mother said she and father recently got into a verbal argument because she caught him cheating and kicked him out. According to the detention report, mother said she "knows not to hit the father because of the risk of her getting the children removed from her care." Mother thought neighbors had called law enforcement because they heard the yelling. Mother said law enforcement officers had talked to mother and father, waited for father to leave, and then left. Mother admitted that she had been arrested for domestic violence with another man while she and father were "on a break."

The following day, February 25, the CSW received information from an anonymous caller that mother was violent and aggressive, and there was video evidence of abuse involving

4

the children.  When the CSW asked for more information, the caller refused to give additional information for fear of retaliation from mother.

DCFS received dispatch summaries for law enforcement calls to the home. There had been 10 calls for domestic violence and yelling at the home between June 2020 and February 2022. Three of the calls occurred while mother was pregnant, and one post-dated the children's birth. In response to a call about fighting and loud banging on April 12, 2021, law enforcement stated that mother was "one month preg having withdrawals from tab."  On October 19, 2021, a caller reported that a male and female were arguing and the male "is hitting her in the street. [Female] is pregnant."  Three days later, on October 22, 2021, law enforcement was called again for "lots of arguing" at the location. The call post-dating the children's birth was for the February 2022 argument. The dispatch summaries did not note any arrests.

On March 1, 2022, DCFS received a report from a caller stating that while the babies were in mother's care, mother had texted, "This is serious I want to hurt myself."  The CSW went to mother's home on March 2, but no one answered the door.  A neighbor told the CSW that loud noises and yelling often came from the home, but he thought the last time he heard it was before the children were born.  The CSW was unable to reach either mother or father by phone, text, or email that day.

The apartment manager called the CSW the following day. She reported that another neighbor had called law enforcement the previous week due to mother and father fighting; the manager had called law enforcement twice before for the same reason.  In one of those incidents, mother told the manager that

father had hit her, but when law enforcement arrived mother said the altercation had been only verbal. The manager also said that when mother moved in two years earlier, mother said she took medication for bipolar disorder. The manager said mother had been aggressive toward her in the past by yelling at her. The manager had never witnessed father in a physical altercation. She said the children were always clean.

The CSWs made another in-home visit on March 8, 2022, stating that they had concerns about the multiple law enforcement calls to the residence. Mother again stated that she did not want to give the CSWs any information, and again the CSWs told mother it would be in her best interest to share her side of the story. Maternal grandmother was there when the CSWs arrived, but she left so she would not be present while mother was being interviewed.

Mother said she was not interested in continuing a relationship with father, and she had been to court to begin the process of seeking full custody of the children and getting child support from father. Mother said father had been to visit the children twice recently, including once to babysit them while mother went out. Mother and father got into an argument at the time. Mother explained that she arrived home to find father asleep while L. was awake with a blanket halfway over him; the diapers of both babies appeared to have not been changed since she left. Mother said she does not trust father with the children.

Mother stated that some of the law enforcement calls involved past roommates rather than her, and the neighbors "call law enforcement for anything they think they hear." Mother denied being violent or aggressive toward anyone. When asked about a past arrest for domestic violence, mother blamed the

incident on an ex-boyfriend. She stated that when law enforcement arrived, they said "one of them had to be arrested." Mother asked the CSWs to not return, because the children were fine.

Mother said she might have postpartum depression, and she sometimes feels alone. She had been prescribed trazodone in the past, but it made her sleepy so she stopped taking it. She also said she was not willing to participate in counseling. She admitted texting a paternal family member that she was sad, but denied expressing any desire to harm father.

The CSW called and texted father on March 11; father returned the call on March 16. Father said he does not have any concerns about the children being in mother's care. Father said he occasionally drinks alcohol and uses marijuana socially. He agreed to submit to a drug test, but said that because he works two jobs, his time was limited.

Regarding the reported domestic violence incident, father said he told mother he cheated on her, so she grabbed him by the shirt and demanded to know why. The children were sleeping in another room at the time. When law enforcement arrived, "they told him he was the victim." He also said that mother has threatened to keep the children away from him. Father said mother does not hit him, but she does cuss at him and call him names. Father admitted there had been multiple law enforcement calls to the residence "due to arguments," and stated that those arguments are why he and mother were currently taking a break from their relationship.

Father stated that he and maternal grandmother had not had a good relationship in the past. He reported that over a year earlier, maternal grandmother came to the home and began

7

physically attacking mother; when he tried to break up the fight, maternal grandmother began attacking him. Father stated that his relationship with maternal grandmother was better now. Father admitted that he had been arrested for driving under the influence, but stated that the charge was eventually dropped.

The CSW spoke with father's mother (paternal grandmother), who stated that father was a victim of intimate partner violence, which father had admitted and paternal grandmother had witnessed. Paternal grandmother said mother and father argue "all the time." She also said mother and maternal grandmother had "jumped" father, hitting him with objects. Paternal grandmother said that recently mother was using the "children as leverage to manipulate" father. Paternal grandmother also said mother hit father while he was holding the children, and mother threatened to hide the children if father reported mother's actions. Paternal grandmother also said she received messages on Instagram from mother stating that mother would kill herself if father did not come home. Paternal grandmother said she had no concerns about the well-being of the children while in father's care.

Both mother and father had prior histories with the dependency system as minors. Mother's involvement was "due to [maternal grandmother's] history of substance abuse, having a criminal conviction of willful cruelty to a child, and leaving the children unsupervised." Father's involvement was "due to physical abuse." A previous DCFS referral regarding mother and baby S. testing positive for marijuana at the time of the twins' birth had been "evaluated out."

On March 23, 2022, the juvenile court issued an order removing the children from both parents' custody. When CSWs

arrived at the home, mother said she did not understand because she told the CSWs not to come back. The CSWs stated that DCFS had concerns about domestic violence and drug use in the children's presence. Mother told the CSW she had obtained a restraining order against father the day before, but when the CSW asked to see it, mother could not produce it. Maternal grandmother was also at the home; she said mother would likely not respond well when DCFS left, including that mother "was going to start hitting things around the home." So maternal grandmother left, saying that she was not going to be able to "deal with" mother's reaction. Mother said she would not cooperate with DCFS, but "[a]fter about 2 hours of deliberation," mother agreed to allow the children to go with the CSWs. A maternal aunt was assessed for placement.

On March 28, DCFS filed a dependency petition under section 300, subdivisions (a) and (b)(1). Allegations a-1 and b-2 alleged that mother and father had a history of engaging in violent physical altercations in the presence of the children, including striking each other and breaking objects, necessitating law enforcement involvement and placing the children at risk of physical harm. Allegation b-1 alleged that mother had a history of substance abuse and was currently an abuser of marijuana, and that mother used marijuana while caring for the children. Allegation b-1 also alleged that father knew of mother's substance abuse and failed to protect the children. Allegation b-3 alleged that mother has mental and emotional problems including suicidal ideation, depression, aggressive behaviors, and a diagnosis of bipolar disorder, rendering her incapable of caring for the children. It noted that mother, while caring for the

children, texted that she wanted to kill or harm herself, and that mother failed to take prescribed psychotropic medication.

At the detention hearing on March 30, 2022, the juvenile court found a prima facie case for detaining the children. The court ordered monitored visitation for both parents.

## B.  **Jurisdiction and disposition**

The jurisdiction/disposition report, filed April 20, 2022, stated that the children were in the care of a maternal aunt. In an interview on April 4, 2022, father explained that the argument in February occurred after he told mother he cheated on her. He said mother "took it like a champ. It says she beat up on me. She didn't hit me at all. She even fainted, fell and dropped the coin vase. The kids were in the other room" asleep at the time.[2] Father said he caught mother when she fainted. Father said there was no violence, and law enforcement was called because "[o]ur neighbor is an asshole."

Father denied drug and alcohol abuse, stating that he did not use marijuana and he only drank alcohol socially. Father also said mother does not use drugs, and the bong at the house was "probably old." Mother and father had both taken drug tests; both were negative. Father had no concerns about the children in mother's care. Father reported that he had not been allowed to see the children since they were detained. He also said he has a three-year-old child who lives with the child's mother; father would not disclose the child's name and claimed to forget the first and last names of the child's mother. Father described his current family life as "overwhelming."

---

[2]     Father explained that the "coin vase" was a glass jar in the kitchen where he and mother kept their spare change.

When mother was asked about the February 2022 domestic violence incident, she said she and father argued but they "didn't even touch each other, not one bit. I cried. That's it. My neighbors, they love to call the cops. . . . I don't know who called when I'm crying and having a mental break down [*sic*]. It's normal to have a mental breakdown; there's other people who put their emotions aside."  Mother said the children were "beautifully sleeping" when she and father argued.  She also stated, "Obviously you see the holes in the wall. I mean at least he's not hitting me and he's hitting the door.  Since the kids were born none of that happened."

Mother admitted there had been domestic violence in the relationship before the children were born. In one incident when she was pregnant, father "threw a taco plate on me. . . .  He grabbed me by my hair and pulled me down.  He pushed me then he choked me so bad to the point that I was scared." However, the violence stopped after the babies were born because father "was just so happy. He was so sweet to me."  Mother also said father was "the best father."  Mother said she had not used marijuana while she was pregnant, but the day she went into labor, she found cocaine in father's pocket, so she used marijuana because "I didn't want to lose my cool."

Mother had started taking domestic violence classes, and she was looking into getting a mental health evaluation. Mother said family members had suggested in the past that she was bipolar, but an assessment suggested major depression instead. Mother said she was "really sensitive" in the postpartum period, but she did not feel depressed or suicidal.

When asked about paternal grandmother's statements regarding domestic violence, mother said paternal grandmother

could not be believed.  Mother said she was willing to do what was needed to get the children back, and "it's the best to have [father] stay away.  I don't know; he might end up getting me upset and maybe I wouldn't be able to control my emotions again."  She also said father was "somebody who has mentally abused me."

DCFS recommended that the petition be sustained.  It stated that mother and father seemed to lack insight with respect to alcohol use, drug use, and domestic violence, and they seemed to have an unresolved history of conflict and violence in the relationship.  DCFS recommended that the children remain detained with the maternal aunt while both parents participated in family reunification services to address domestic violence, drug abuse, and mental health issues.

At the adjudication hearing, the minors' counsel and DCFS's counsel requested that the petition be sustained as alleged.  Mother's counsel and father's counsel asked that the petition be dismissed.  Regarding disposition, father's counsel requested that the children be released to him or that he be granted unmonitored visitation.

The court sustained the petition as alleged, finding the children to be persons described by section 300, subdivisions (a) and (b).  Turning to disposition, the court found by clear and convincing evidence that continuing in the parents' homes would pose a substantial danger to the children's health, safety, and well-being.  The court ordered reunification services for both parents, monitored visitation for both parents with DCFS discretion to liberalize, and various additional services.

Father and mother each timely appealed.

**DISCUSSION**

Mother asserts there was insufficient evidence to support a finding of jurisdiction over the children. Father asserts there was insufficient evidence to support the juvenile court's disposition order that the children be removed from his care. "'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court."'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

**A. Jurisdiction**

Mother challenges the juvenile court's finding of jurisdiction over the children on each of the three grounds in the sustained petition under section 300, subdivisions (a) and former (b)(1)[3]: domestic violence; drug abuse; and mental and emotional problems. We need not address all three. "When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for

_____

[3]     The Legislature amended Welfare and Institutions Code section 300, effective January 1, 2023, in part by rewriting subdivision (b)(1).  The change does not affect our analysis.

13

jurisdiction are supported by the evidence." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

Mother contends substantial evidence does not support a finding that the children were at risk due to domestic violence. She asserts there was insufficient evidence that she and father ever engaged in domestic violence, because the evidence showed they had only verbal altercations. Mother also asserts that at the time of the May 2022 jurisdiction hearing, she and father had separated and there was no evidence that domestic violence between the parents would recur.

"Exposure to domestic violence may serve as the basis for dependency jurisdiction." (*In re Cole L.* (2021) 70 Cal.App.5th 591, 602.) A "cycle of violence" between the parents may constitute a failure to protect children "'from the substantial risk of encountering the violence and suffering serious physical harm or illness from it.'" (*In re T.V.* (2013) 217 Cal.App.4th 126, 135.) "'[T]he question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm.'" (*In re M.W.* (2015) 238 Cal.App.4th 1444, 1453.) Domestic violence involving a parent may support the exercise of jurisdiction where there is evidence that the violence placed the children at risk of harm, and the violence is ongoing or likely to continue. (*Ibid.*)

Substantial evidence supports a finding of domestic violence in many different forms that extended beyond the relationship between mother and father. Mother herself told CSWs that father pulled her down by the hair and choked her while she was pregnant. Law enforcement had been called to the home multiple times during mother and father's arguments, including while mother was pregnant and after the children were

14

born.  Paternal grandmother reported that mother hit father in the presence of the children.  Mother told the CSW that father had punched holes in the walls of their home, stating, "at least he's not hitting me."  A glass coin vase was shattered during an argument while the babies were in the house.  Mother texted a family member or posted on Instagram that she was upset and wanted to hit father or harm herself. Maternal grandmother left the premises as the children were being removed from mother, saying that mother would likely start hitting things after DCFS workers left. Father reported that a year earlier, there was a domestic violence incident in which maternal grandmother physically attacked mother.

Mother points to her and father's statements that the arguments between them were only verbal, not physical, and that the children were not present when they argued.  However, the juvenile court was not required to rely on mother and father's statements to the exclusion of the other evidence.  (See, e.g., *In re Dakota H.* (2005) 132 Cal.App.4th 212, 228 [a "judgment will be upheld if it is supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence"].)  Moreover, the record shows that mother and father were not always forthcoming about what transpired between them.  Mother told a CSW she got a restraining order against father, but she was unable to produce it. DCFS stated in its reports that both mother and father seemed to be minimizing their domestic violence issues.  Paternal grandmother said mother hit father while he was holding the children, and that mother threatened to keep the children away from father if he reported mother's actions.  In addition, the apartment manager

15

said mother reported that father hit her, but when law enforcement arrived mother changed her story.

Mother also contends that there was no longer a risk of violence because she and father had separated. However, "[e]vidence of past conduct may be probative of current conditions" if there is "'some reason beyond mere speculation to believe the alleged conduct will recur.'" (*In re D.L.* (2018) 22 Cal.App.5th 1142, 1146.) Here, there was evidence supporting a finding that the violence would continue, because the evidence showed domestic violence even when mother and father were not together. Mother had been arrested for domestic violence with another partner while she and father were on a break, and there had been a domestic violence incident involving mother and maternal grandmother. In addition, even after mother and father separated and while the juvenile court case was pending, mother and father got into an argument when father cared for the children. In addition, mother told the CSW that she wanted father to stay away because "he might end up getting me upset and maybe I wouldn't be able to control my emotions again." In short, sufficient evidence supported the juvenile court's finding that there was a risk the violence would continue.

Because we find that the juvenile court properly exercised jurisdiction over the children due to domestic violence in the home, we need not address mother's alternate challenges to jurisdiction. We therefore turn to father's appeal.

B.    **Disposition**

Father contends that despite the sustained petition, the children should have been returned to his care. He argues that he was cooperating with DCFS, he had separated from mother, he had tested negative for drugs and alcohol, and there were

16

reasonable means of protecting the children without removing them from him.

"A dependent child shall not be taken from the physical custody of his or her parents . . . unless the juvenile court finds clear and convincing evidence" that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).)

"The jurisdictional findings are prima facie evidence that the child cannot safely remain in the home. (§ 361, subd. (c)(1).) The parent need not be dangerous and the child need not have been actually harmed for removal to be appropriate. The focus of the statute is on averting harm to the child." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.) As discussed above, there was substantial evidence of domestic violence in the home, and father was found to be an offending parent. Mother told CSWs that father choked her while she was pregnant, calls to law enforcement said father hit mother, mother told the CSW that father had punched holes in the walls, and paternal grandmother reported that father hid or minimized mother's domestic violence toward him because father feared mother would keep the children away from him.

Father argues that "the twins were not injured in any incident between mother and father," and "there was no ongoing domestic violence after they were born that would cause long-term" emotional damage. However, a juvenile court "need not wait until a child is seriously abused or injured to assume

17

jurisdiction and take steps necessary to protect the child." (*In re N.M.* (2011) 197 Cal.App.4th 159, 165.) The evidence of domestic violence here, including father's failure to protect the children, supported the juvenile court's finding that there were no reasonable means to protect the children without removing the children from father's care.[4]

## C.   ICWA

Both mother and father filled out forms stating that they did not have Native American ancestry, and accordingly the juvenile court found that ICWA did not apply. Father contends DCFS failed to comply with investigation requirements under ICWA, and therefore the juvenile court erred in finding that ICWA did not apply. Father asks that the case be remanded to require compliance with ICWA.

While this appeal was pending, the juvenile court ordered DCFS to comply with ICWA's investigation requirements; we granted DCFS's request for judicial notice of this order. DCFS therefore asserts father's ICWA contention is moot. We agree. "An appeal may become moot where subsequent events, including orders by the juvenile court, render it impossible for the reviewing court to grant effective relief." (*In re E.T.* (2013) 217 Cal.App.4th 426, 436.) Because the juvenile court has already ordered DCFS to comply with ICWA requirements, reversal and remand are not warranted.

---

[4]   We also note that there is no evidence in the record about father's living situation, aside from a passing comment that father had gone to his aunt's house when he and mother decided to separate. There is no information as to whether father had a living space that could accommodate the twin infants, or whether he had access to childcare while he worked his two jobs.

## DISPOSITION

The juvenile court's jurisdiction and disposition orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


CURREY, P.J.


MORI, J.